John T. PICKENS, Appellant,

v.

J.A. HOPE, Jr., Appellee.

No. 04–87–00475–CV.

Court of Appeals of Texas,
San Antonio.

Dec. 7, 1988.

Hubert W. Green, Robert W. Loree, Diego J. Pena, Green & McReynolds, James N. Castleberry, Jr., San Antonio, A.E. Aikman, Dallas, for appellant.

Charles J. Fitzpatrick, F.W. Baker, Annalyn G. Smith, Matthews & Branscomb, Jesse Gamez, San Antonio, for appellee.

Howard F. Moeck, Jr., Dallas, for amicus curiae Enserch Exploration, Inc. of Dallas.

Before CADENA, C.J., and ESQUIVEL and BISSETT,* JJ.

## OPINION

BISSETT, Justice (Assigned).

The controlling issue to be resolved in this appeal is whether the mineral fee owner (the holder of the executive rights) has breached a duty owed to the owner of a term non-participating royalty interest (the non-executive) by failing to lease his land to another for the development and production of tar from a deposit of tar underlying

---

* Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex.Gov't.

Code Ann. 74.003 (Vernon 1988).

the land, or by failing to develop and produce the tar himself. In order to decide whether there has been a breach of duty, we must determine the standard of duty owed to the non-executive and whether the standard is measured by a fiduciary duty arising from the relationship of the parties, as held in *Manges v. Guerra*, 673 S.W.2d 180 (Tex.1984), or whether the standard is measured by the breach of an implied covenant arising out of the deed which reserved the term non-participating royalty in the minerals to the grantors in the deed, as held by the courts prior to the decision in *Manges*. As will be shown, in classifying the nature of the executive rights and the standard of duty owed by the executive to the non-executive, courts have approached the problem from various angles and under several theories. *See* Note, *Manges v. Guerra: The Executive Right Holder Undergoes Close Scrutiny*, 38 Baylor L.Rev. 189–210 (1986); Smith, *Implications of a Fiduciary Standard of Conduct for the Holder of the Executive Right*, 64 Texas L.Rev. 371–406 (1985).

The standard of duty which has been imposed on the executive by the courts has ranged from that of fiduciary to that of ordinary care and good faith. In between these standards is the standard of good faith and utmost fair dealing. While all courts have recognized that a duty exists, simply acknowledging that a duty exists has not settled the matter. This is made clear by the decision in *Manges*, where it is argued by some of the commentators that the court departed from accepted positions by the courts in the past.

John T. Pickens, hereafter "Pickens," the owner of the surface and the minerals underlying the Chaney Lake Ranch (3,023 acres) in Maverick and Zavala Counties, filed suit in 1981 against J.A. Hope, Jr., hereafter "Hope," to remove cloud from his title caused by the execution by Hope of a royalty deed to Oil Field Transportation Company, hereafter "Oil Field." The latter intervened in the lawsuit. Hope and Oil Field then filed pleadings wherein each claimed that Pickens, as the holder of the executive rights of the mineral estate, breached a duty owed to them of "good faith and utmost fair dealing" by failing to produce minerals before their term royalties expired. The trial court granted summary judgment to Pickens in his suit to remove cloud from title and decreed that Hope and Oil Field each owned a ⅛₄th non-participating term royalty in the minerals underlying the Lake Chaney Ranch, hereafter "the ranch." The cause of action asserted by Hope and Oil Field against Pickens was severed from the suit brought by Pickens to remove cloud from title. Thereafter, the parties were realigned with Hope and Oil Field as plaintiffs and Pickens as defendant.

After a jury trial on the claims of Hope and Oil Field, Hope obtained favorable findings against Pickens, but Oil Field did not. The jury awarded Hope $2,250,000 actual damages and $500,000 exemplary damages against Pickens. The trial court first rendered judgment that Hope recover $2,750,000 from Pickens and that Oil Field recover nothing. Upon motion for new trial, the court ordered a remittitur of $950,000 actual damages and rendered judgment that Hope recover against Pickens $1,300,000 actual damages and $500,000 exemplary damages, and that Oil Field recover nothing. Pickens has appealed. Oil Field has not appealed.

Pickens first contends that there was no evidence to support the jury's finding that he breached any duty owed to Hope. In disposing of the "no evidence" point, we follow the well-established rule which requires that we consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. Citation of authorities in support of the above standard of review is not necessary. In the interest of completeness, we set out and summarize all of the evidence. The controlling facts are undisputed.

On June 10, 1965, Hope and wife conveyed the ranch to W.L. Pickens, father of appellant Pickens. In the deed, the grantors reserved unto themselves,

 ... as a non-participating royalty, an undivided ¼ of the usual ⅛ royalty in all of

the oil, gas or other minerals produced, saved and sold from the premises conveyed under the terms of any valid oil and gas lease....

It was further provided in the deed that the royalty was reserved for a term of 20 years, and as long thereafter as oil, gas and other minerals is produced from the land "in paying or commercial quantities."

After acquiring the ranch in 1974, Pickens engaged experts to advise him on the ranch's potential for the production of minerals. They made detailed studies and informed him that there was neither oil nor gas underlying the ranch, and that the only prospect for mineral production was tar from the San Miguel Formation at about 1,700 feet below the surface of the ground. Thereafter, other experts were employed by Pickens to assess the volume and value of the tar if the sands were produced. As a result, Pickens was informed that 98,000,000 barrels of recoverable tar could be produced from the ranch, and assuming a 20–year production period and further assuming that the price of oil would escalate from $38.00 to $75.00 per barrel over a period of ten years (1981–1991), that he, if he leased the ranch and retained a ³⁄₁₆ths royalty, would receive $868,000,000 in royalties during the life of production. Pickens was also informed that, if he developed the tar sands himself, his profit would be in excess of $3,000,000,000. The assumptions as to the escalations of the price of oil proved to be incorrect.

The average price per barrel for oil for the years 1981 through 1986 was:

| | |
|---|---|
| 1981 | $36.03 |
| 1982 | 30.42 |
| 1983 | 28.38 |
| 1984 | 27.41 |
| 1985 | 25.65 |
| 1986 | 15.49 |

In 1980, Hope sold one-half of his royalty to Oil Field for $40,000 cash.

In 1974, General American Oil Co. offered to lease the ranch for mineral development on the following terms: 1) $10 per acre cash bonus; 2) a 10–year primary term; and 3) a ⅛th royalty. Pickens refused to lease on the grounds that the cash bonus was inadequate; the royalty was too

small; and the other provisions in the lease were unacceptable. In 1978, Ray Southworth offered to lease the ranch for mineral development and agreed to pay a cash bonus of $30–35 per acre. A copy of the lease is not in the record, and no other details of the offer are shown by the evidence. Pickens rejected Southworth's offer.

In 1981, Conoco, Inc. expressed interest in leasing the ranch for mineral development. However, it did not make an offer to lease it.

By letter dated October 2, 1980, Winn Exploration Co., hereafter "Winn," offered to lease the ranch for mineral exploration on the following terms: 1) a cash bonus of $269,000; 2) a 5–year primary term; 3) a royalty of 17.5%; and 4) an annual delay rental of $5 per acre. A copy of this proposed lease is not in the record. The offer was rejected by Pickens. Next, Winn offered to lease the ranch for the production of oil, gas, sulphur, and "associated substances." A copy of this proposed lease is in the record. It was dated March 9, 1981, and provided for: 1) the payment of $259,835 cash bonus; 2) a 5–year primary term; 3) a ³⁄₁₆ths royalty; and 4) payment of annual delay rentals. Pickens rejected this offer on the ground that he could not lease the ranch because of the existing lawsuit to remove the cloud from his title. However, by letter dated November 8, 1982, Pickens offered to lease 2,173 acres of the ranch to Winn upon the following terms: 1) a cash bonus of $50.00 per acre; 2) a ⁵⁄₃₂nds royalty, excluding any outstanding non-participating royalty; 3) a 1–year primary term; 4) excepting the tar sands; and 5) certain provisions relating to ranching operations. Winn rejected this offer, and on December 16, 1982, made a counter offer, whereby it offered to lease the acreage for the exploration and development of oil and gas only; it further offered 1) a $151,184 cash bonus; 2) a 3–year primary term, and 3) a delay rental of $6 per acre. Pickens rejected the counter offer.

C.C. Winn, an executive of Winn Exploration, testified that during the time when he was attempting to lease the ranch, he

believed that it could be productive of gas. Based on his experts' opinion, he testified that there was at least twenty-four billion cubic feet of gas underlying the ranch. Pickens' experts, as already noted, had a totally different opinion.

Pickens, on August 3, 1983, again offered to lease the ranch to Winn for mineral development, excepting the tar sands. His proposal was for a primary term of 2 years, with the reservation of ⁹⁄₁₆ths royalty, including the outstanding non-participating royalty, and numerous other provisions. The offer was not accepted by Winn. In March, 1986, after Hope's term royalty had expired, Pickens executed a lease to Winn on the ranch which excluded the tar sands. Winn drilled four dry holes thereon. The lease terminated for failure to obtain production of oil or gas.

Pickens, by lease dated February 24, 1984, leased the ranch to Texas Tar Sands, Ltd. for oil and gas. The tar sands were excepted from the lease. The lessee drilled a dry hole on the ranch sometime after August 8, 1984. No further drilling was conducted, and the lease terminated prior to June 10, 1985, for failure to obtain production of oil or gas.

Next, we turn to the evidence relating to tar production in the area of the ranch. Tar is considered the worst and lowest form of hydrocarbon. It is highly viscous, immobile, and solid in its natural state. It requires intense heat to become liquid and moveable. Upon heating to a point where it is liquid, and without blending, hereinafter more particularly discussed, it solidifies after reaching the surface.

The only viable process for the production of tar was developed by Conoco, Inc., hereafter "Conoco," in the 1970's. It was named the "Fracture Assisted Steamflood Technology," commonly known in mineral circles as the "FAST" Technology, or process. Under that technology, first five acres and later seven and one-half acres were developed as a unit. In the five-acre unit, a steam injection well was drilled in the center and was surrounded by four production wells; this proved to be unsatisfactory and the unit was enlarged to seven and one-half acres. In the enlarged unit, two steam injection wells were drilled, which were surrounded by six production wells. In order for the tar not to solidify after it reached the surface, it was necessary to pump conventional oil into the formation so that it would blend with the heated tar. The production, as a result of such blending, would consist of 50% conventional oil and 50% tar, called "syncrude," and would remain liquid after it was pumped into the storage tanks.

To produce tar commercially, vast sums of money were required for the purchase and installation of equipment, such as: 1) a steam generator required by the FAST process to produce steam to heat the tar in the formation; 2) an adequate supply of fuel (coal) to fuel the steam generator; 3) a steady and dependable water supply; and 4) an upgrading facility to remove sulphur, clay, limestone, and other impurities from the blended product and thus make it acceptable and saleable to conventional refineries. Other requirements were: 1) a pipeline or fleet of tanker trucks to transport the upgraded product to a refinery; and 2) access to a refinery.

From 1976 until January, 1985, there was production of tar from several pilot plants in the immediate vicinity of the ranch. These plants, which were experimental, did not contain the upgrading facilities; however, they did demonstrate the technical feasibility of producing the tar, using the FAST process. Four such plants were near the ranch. The production of the blended product, in barrels, from such plants for the years 1976 to January, 1985, was:

| Year | Conoco Street Ranch | Conoco Saner Ranch | Exxon Waukesa– Pearce Lease | Texas Tar Sands Bennett Ranch |
|------|---------------------|--------------------|-----------------------------|-------------------------------|
| 1976 | 694 | 0 | 0 | 0 |

| Year | Conoco Street Ranch | Conoco Saner Ranch | Exxon Waukesa– Pearce Lease | Texas Tar Sands Bennett Ranch |
|------|------|------|------|------|
| 1977 | 867 | 0 | 0 | 0 |
| 1978 | 79,874 | 0 | 0 | 0 |
| 1979 | 74,131 | 0 | 0 | 0 |
| 1980 | 15,387 | 0 | 0 | 0 |
| 1981 | 0 | 56,122 | 0 | 0 |
| 1982 | 0 | 77,647 | 5,748 | 0 |
| 1983 | 0 | 5,018 | 31,630 | 0 |
| 1984 | 0 | 1,392 | 20,830 | 16,500 |
| 1985 | 0 | 0 | 5,050 | 0 |
| Total barrels produced | 170,955 | 140,679 | 58,258 | 16,500 |

Conoco shut down all operations for the production of tar in 1984. Concerning the Street Ranch pilot plant operations, its capital costs were about $2,200,000, and its operating costs were between $3,000,000 and $4,000,000. With respect to the Saner Ranch operations, its capital costs were about $10,000,000, and its operating costs were about $4,000,000 per year. All told, it spent $40,000,000 in obtaining production of tar in its two pilot plants. The total production was sold for $3,300,000, resulting in a net loss of $36,700,000. Texas Tar Sands lost $12,000,000 from its pilot plant operations on the Bennett Ranch. Its operations were also shut down in 1984. There is no evidence as to the loss, if any, suffered by Exxon in its operations, which were shut down in January, 1985.

Conoco prepared an "Economic Feasibility Study," dated September 13, 1985, wherein it concluded:

Escalating the South Texas Tar Sands Project to a full scale, commercial project is not economically feasible at this time. However, the potential for this project to become feasible still exists.

Given a more favorable economy, higher tar prices, better steam-to-oil ratios and future improvements in technology, this project could become a viable source of alternative energy....

To move from the "pilot stage" to a "full scale, commercial project," required a "wave-type development," reaching production of 10,000 barrels per day, and would cost (in 1981) many millions of dollars. To produce 10,000 barrels per day, constant production from 50 tracts of 7½ acres each would be required. Heating the tar in place would require six months, and, after "heating-up," all of the recoverable tar from the 50 tracts would be produced in two to two and one-half years. In addition to the drilling of the necessary steam-injection wells (100), the drilling of production wells (300), and the purchase and installation of the machinery and equipment necessary to upgrade the tar, other requirements had to be met. They were: 1) a 15–year contract for the sale of the upgraded product to a refinery; 2) a $9–10 differential per barrel between the price of conventional oil and the price of the blended product; 3) adequate water resources for the generating of steam; 4) sufficient fuel supply for the steam generator; and, 5) for anyone other than a major oil company, financial institutions willing to lend the money necessary for the construction of the plant and appurtenant installations and equipment.

The ranch was the only tract of land in the immediate area of the four pilot plants that was not under a "tar" lease at the time in question. Pickens did not make any effort to lease the ranch for development of the tar sands. However, he did attempt the joint development of the tar, first with Conoco and later with Texas Tar Sands, Ltd., hereinafter particularly discussed.

In June, 1981, Conoco proposed a joint venture with Pickens for the production of tar underlying the ranch. Basically, it proposed: 1) Pickens would commit the entire ranch to the project; 2) an agreement would be executed which would provide for a three-year exploratory period, to commence on the date the agreement was signed; 3) operations for the production of tar would commence no later than five years from the end of the exploratory period; and 4) Conoco's technology would remain confidential. Pickens advised Conoco that he could not guarantee "confidentiality" because of the pending lawsuit to remove cloud from title. On March 18, 1982, Conoco abandoned negotiations with Pickens and withdrew its proposal for a joint venture to produce the tar under the ranch, citing, among other reasons, the "current economic conditions" then prevailing.

Next, Pickens commenced negotiations with Texas Tar Sands, Ltd., a limited partnership, composed of Enpex, a corporation, as the general partner, and Ray Southworth, Superior Oil Company, Getty Oil Company, and the Whittier family as limited partners. At that time, Texas Tar Sands had the leases on the Bennett and Rambie ranches, both of which joined the Pickens ranch. Initially, Enpex, the general partner, proposed the development of the tar sands under the Bennett and Rambie ranches. In August, 1981, Enpex suggested to Pickens that the project be enlarged to include his ranch. Pickens and Enpex then commenced negotiations for a joint venture to produce tar from all three ranches. Tentative agreements and understandings were reached and plans were made for such development. The conditions imposed by Pickens, in connection with his participation in the project, thereafter known as the "Enpex/Syntaro" project, were set out in a letter by him to Enpex, dated May 19, 1982, which, in part, stated:

(3) Assuming that a market exists for the produced tar and the tar can be produced with adequate returns, I would anticipate that I would participate in the "tar sands production block" through a joint venture agreement.

(4) At current oil prices, it appears that it is not economically feasible to produce the tar. Therefore, unless either market conditions change or some form of price support is available from U.S. Synthetic Fuels Corporation, these resources cannot now be developed.

In June, 1982, Pickens made an initial payment of $75,000 to join the Enpex/Syntaro project as a participant. This entitled him to participate in the anticipated U.S. Synthetic Fuels Corporation price support, to an interest in the proposed tar upgrading facility, and to a percentage of the tar production from development blocks on either the Bennett, Rambie or Pickens ranches or from blocks composed of parts of each ranch. In turn, Pickens agreed to contribute acreage out of his ranch to the development blocks. Specifically, it was contemplated that Pickens would commit 160 acres to a development block, which would later be increased to 1,240 acres. Such commitments were conditionally made by Pickens, which conditions were never met.

The research and planning by Enpex were enormous. It was agreed that the FAST process would be used, for which Conoco would be paid a licensee fee of $250,000. The necessary upgrading facility and other needed equipment would be purchased and installed. Initial production of 1,200 barrels per day of the blended product was planned to begin in 1983. The planned production for the first six years of operation was:

| Year | Barrels Per Day |
|------|-----------------|
| 1983 | 1,200 |
| 1984 | 1,200 |
| 1985 | 1,500 |
| 1986 | 10,000 |
| 1987 | 12,000 |
| 1988 | 15,000 |

The drilling of the steam injection wells and the production wells and the construction of the upgrader facility, together with the time required for the "heating-up" of the tar in place, would take three years, which meant that *commercial* production of 10,000 barrels per day would be delayed until 1986. To reach that level of produc-

tion, however, 5,000 barrels of conventional oil would have to be purchased and injected daily into the tar sands formation in order to produce a product in an acceptable and marketable state. Should a pipeline to a refinery not be built, transportation of the blended product (10,000 barrels per day) would require the use of 133 tanker trucks on a daily basis. The ultimate goal of production was 150,000 barrels per day, which, hopefully, would be reached in 1995.

The capital for the project would be contributed as follows: the participants would contribute money and property as set out in the subscription agreement for an estimated capital of $700,000,000. Pickens was committed to $3,000,000 and the aforesaid acreage if all of his conditions were met. Later, Chaparrosa Oil Company and Tesoro Petroleum Corporation joined the venture. Tesoro agreed to contribute its Carrizo Springs refinery which would refine the upgraded tar product.

An essential requirement for the production of tar was a price guarantee, authorized by the U.S. Synthetic Fuels Corporation Act, 42 U.S.C. § 8734 (1982).[1] No investor, other than a major oil company, was financially able to begin the simultaneous drilling of the wells for fifty production units or the construction of the upgrader facility and installation of equipment appurtenant thereto without a U.S. Government price guarantee which would ensure profitable production and sale of the product.

Four applications were made by Enpex to the U.S. Synthetic Fuels Corporation for a price guarantee. In the applications, it was stated that the production costs would be approximately $26 per barrel, "while the tar product commends a price of $10 per barrel or less in the marketplace." The first application, made in May, 1982, was for a guarantee of $900,000,000. It was denied. A second application for a guarantee of $500,000,000 was denied in December, 1982. A third application was denied in January, 1983. A fourth application was

filed. By letter dated March 27, 1985, Enpex informed Pickens that the fourth application had been denied. The Enpex/Syntaro project was then abandoned by all parties concerned. At the time of the abandonment, Pickens had spent $650,000 on the project.

On March 14, 1986, Pickens executed a written document which unilaterally extended the term of the non-participating royalty until June 10, 1990. Hope, by written instrument, acknowledged on July 25, 1986, effective June 10, 1965, refused the extension. Oil Field did not refuse or accept such extension by a written instrument.

All pilot plant operations for the production of tar in the area of the ranch were abandoned prior to June 10, 1985. On that date, there was no production of minerals of any kind on the ranch, nor was there any such production anywhere in the area of the ranch on that date or at the time of trial.

The non-participating royalty interest in the minerals under the ranch terminated on June 10, 1985.

Hope's deed reservation of the royalty did not impose any express duties on W.L. Pickens, the original grantee in the deed. Because, however, the non-participating royalty owner must depend upon the mineral fee owner for the enjoyment of his interest, the courts have implied a covenant of the utmost fair dealing in the exercise of the executive rights to lease or develop the minerals. *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, 545 (Tex.Comm'n App. 1937, opinion adopted); *Morriss v. First National Bank of Mission*, 249 S.W.2d 269, 276 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.).

 A mineral fee owner has a possessory estate in the land. As such he has the right to develop the minerals himself or the exclusive power to lease the land to another for mineral development. *Elick v. Champlin Petroleum Co.*, 697 S.W.2d 1,

---

**1.** The Synthetic Fuels Corporation and its financial price support guarantee program was terminated by Acts of Congress, effective December

19, 1985 and April 7, 1986, Pub.L. Nos. 99–190, 99–272.

3-4 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Campbell v. Dreier*, 382 S.W.2d 179, 183 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e.). On the other hand, a non-participating royalty owner has no possessory estate in the land, and hence, no right to lease the land to another for mineral development or to produce the minerals himself. *Martin v. Schneider*, 622 S.W.2d 620, 622 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.).

A "non-participating royalty" does not entitle the owner to produce the minerals himself, or permit him to join in a lease of the mineral estate to which the royalty is appurtenant, or entitle him to share in bonus or delay rentals that may be paid for the lease, but merely entitles him to a share of production under the lease free of exploration and production expenses. *Arnold v. Ashbel Smith Land Co.*, 307 S.W.2d 818 (Tex.Civ.App.—Houston 1957, writ ref'd n.r.e.).

Special Issue No. 1, reads as follows: Do you find from a preponderance of the evidence that Defendant John T. Pickens breached a duty to Plaintiff J.A. Hope, Jr., of good faith and utmost fair dealing, by failing to lease or develop the oil, gas and other minerals under the Chaney Lake Ranch?

To which, the jury answered "Yes."

The trial judge, in his FOURTH INSTRUCTION, instructed the jury, as follows:

By the term "EXECUTIVE RIGHT" is meant the right to lease lands for exploration, development and production of oil and gas.

The possessor of an "EXECUTIVE RIGHT" as herein defined owes to the royalty owners the same degree of diligence and discretion in exercising the rights and powers granted under such Executive Rights as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to either (1) seek or to cooperate with prospective lessees or (2) to develop such lands himself, but he is not under a duty to develop such lands himself unless there is a reasonable expectation of profit. In the exercise of the executive rights, the holder thereof has a duty to use utmost good faith and fair dealing as to the interest of the non-participating royalty owner.

By the term "UTMOST FAIR DEALING" is meant the use of the same degree of diligence and discretion in exercising the rights and powers held by an executive owner as would be utilized by the average landowner seeking to obtain all the benefits that could be reasonably obtained for himself and for his non-participating royalty owner from a disinterested third party either (1) by leasing such lands for exploration or (2) developing such lands himself.

Pickens contends that the standard of duty owed to Hope, as measured by the trial court's charge to the jury, is that of the average landowner seeking to obtain all of the benefits that could be reasonably obtained for himself and his non-participating term royalty owners. He further contends that the jury's answer to Special Issue No. 1 is no more than a finding of breach of an implied covenant of good faith and utmost fair dealing created by the deed from Hope to W.L. Pickens in 1965. Hope contends that Pickens owed him the duty of good faith and utmost fair dealing as measured by a fiduciary duty arising out of their relationship, and that the jury's answer to the issue is a finding of a breach of fiduciary duty.

The realization of benefits of the ownership of a non-participating royalty interest is dependant upon the production of minerals from the lands pertinent thereto either by a lessee of the holder of the executive rights or by the owner of the mineral estate himself. Case law holds that some kind of duty is owed by the executive to the non-executive, but there may be a variance concerning the standard to which the executive will be held in the exercise of his executive right.

The Supreme Court of Texas, in *Manges v. Guerra*, 673 S.W.2d 180 (Tex.1984), held the executive to a standard of good faith and utmost fair dealing, but characterized the standard as a fiduciary duty arising out

of the relationship between the executive and the non-executive, and not out of the contract or deed. Earlier, the Supreme Court in *Wintermann v. McDonald*, 129 Tex. 275, 102 S.W.2d 167, 173 (1937), held that the landowner (the executive) owed a duty of good faith to the State (the non-executive), and that he should discharge that duty with prudence and good faith, and with ordinary care and diligence. Also, the Court, in *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543 (1937), imposed the standard of duty of good faith and utmost fair dealing on the executive. However, a Court of Civil Appeals, in *First National Bank of Snyder v. Evans*, 169 S.W.2d 754, 757 (Tex.Civ.App.—Eastland 1943, writ ref'd), held the executive, who had conveyed a life estate in the *minerals* to the non-executive, to a strict standard of care, characterized as a "relation of trust." Until *Manges*, most courts imposed the standard on the executive as set out in *Schlittler*, that of good faith and utmost fair dealing. In between the standard of "fiduciary duty" and "good faith and utmost fair dealing" is the standard set forth in *Federal Land Bank of Houston v. United States*, 144 Ct.Cl. 173, 168 F.Supp. 788, 791 (1958), where it was stated:

> We are of the opinion that the court should require the same diligence and discretion on the part of the mineral fee holder as would be expected of the average land owner ...

According to a leading commentator, the standard of the executive in leasing the land for mineral development is that of an ordinary, prudent landowner. *See* 2 H. Williams & C. Meyers, Oil and Gas Law § 339.2, at 209–10, it is stated:

> The executive is required to exercise his exclusive leasing power in the same manner as an ordinary, prudent landowner would exercise the leasing power inherent in the mineral fee. The executive's conduct will be judged by such standard, as if no royalty or nonexecutive mineral interest were outstanding. Where the interests of the executive and the nonexecutive coincide, the failure to exercise the executive right or the improper exercise thereof due to carelessness, inattention, indifference, or bad faith will result in liability. Where the interests of the executive and nonexecutive diverge, the executive will not be bound to a standard of selfless conduct, such as that imposed on trustees or guardians. He may exercise the executive right with the same self-interest in mind as if there were no outstanding royalty or nonexecutive mineral interest.... If the conduct of the executive satisfies the ordinary, prudent landowner standard, the fact that the nonexecutive owner has been harmed is not actionable under this view.... We believe this standard fairly effectuates the intent of the parties: it does not require more than can be expected of ordinary landowners and it does not permit less....

The duty imposed upon Pickens by the trial court's charge finds support in *Kimsey v. Fore*, 593 S.W.2d 107, 111 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.), in *Portwood v. Buckalew*, 521 S.W.2d 904, 911 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.), in *Morriss v. First National Bank of Mission*, 249 S.W.2d 269, 276 (Tex.Civ. App.—San Antonio 1952, writ ref'd n.r.e.), and in the many other cases cited in the opinions in the above-mentioned cases.

In *Portwood* and *Kimsey*, the duty of utmost fair dealing was considered to be an implied covenant arising from the deed which created the executive rights.

The Court in *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.1981), noted that there are three broad implied covenants in an oil, gas and mineral lease. They are: 1) to develop the premises; 2) to protect the leasehold; and 3) to manage and administer the lease. Concerning the standard of duty owed the lessor by the lessee, it was said:

> The standard of care in testing the performance of implied covenants by lessees is that of a reasonable prudent operator under the same or similar facts and circumstances ... The reasonably prudent operator concept is an essential part of every implied covenant ...

*Id.* at 567–68.

■ Hope relies upon *Manges v. Guerra*, 673 S.W.2d 180 (Tex.1984) and *Co-*

*manche Land & Cattle Co. v. Adams*, 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ) in support of his contentions that the duty owed him by Pickens was that of a fiduciary, and that he breached that duty. We disagree.

In *Manges v. Guerra*, Clinton Manges purchased the surface and slightly more than a one-half undivided interest in the mineral estate of a large tract of land from various members of the Guerra family. He also received the executive right to lease the Guerra mineral interest. Manges later executed a deed of trust, a second security agreement, and several other contracts covering both his mineral interest and the executive right. Subsequently, he leased part of the Guerras' mineral interest to himself for a nominal consideration (five dollars) and, thereafter, obtained production. Manges then executed a farm-out agreement to a third party operator, retaining a fifty percent working interest free of drilling costs. In addition, he executed a top lease to the third party operator. The Guerras sued, claiming that Manges had breached his duty as an executive by encumbering their interest, leasing to himself, and securing benefits for himself alone. The trial court found for the Guerras, ordering that: 1) Manges be removed as executive; 2) the Manges-to-Manges leases be cancelled as of the date of execution; 3) the Guerras receive an accounting from Manges for proceeds from production consistent with the Guerras' status as co-tenants; 4) the Guerras be awarded $382,-000 actual damages as compensation for what they would have received if Manges had timely leased to a third person; 5) the Guerras be awarded $500,000 in exemplary damages; and 6) the various instruments executed by Manges did not affect the Guerras' interest. The Court of Civil Appeals affirmed. *Manges v. Guerra*, 621 S.W.2d 652 (Tex.Civ.App.—Waco 1981). The Supreme Court affirmed the judgments of the lower courts except those parts of the judgments which removed Manges as holder of the executive rights.

In *Manges*, the Guerras and Manges each owned an undivided one-half interest in the minerals, which made them co-tenants in the mineral estate. Such ownership did not exist in the case now before this Court. Unlike Hope, who owned only a ¹⁄₆₄th non-participating royalty, the Guerras owned one-half of the mineral estate and were entitled to one-half of *all* benefits accruing to the mineral estate, including bonus, delay rentals and royalties. In *Manges*, the executive did not extract the same benefit for the non-executive as he did for himself. That did not happen in the present case. Undoubtedly, the conveyance by the Guerras of the executive rights in the mineral estate created a privilege and a duty on the part of Manges to manage the mineral property belonging to the Guerras. This duty to manage is certainly fiduciary in nature. No duty to manage the non-participating royalty was ever conferred on Pickens. Manges committed specific acts of self-dealing (e.g., leasing to himself and providing for a "back-in" 50% working interest, free of cost, to himself in the farm-out) which deprived his co-tenants of bonus, delay rentals and royalties. There is no self-dealing in the instant case. The Supreme Court held that Manges breached a fiduciary duty on the facts presented. It described this breach as follows:

> In our opinion Manges' conduct amounted to a breach of his fiduciary duty as found by the jury in making the lease to himself, in agreeing upon a $5 nominal bonus for 25,911.62 acres of land, and in dealing with the entire mineral interest so that *he received benefits that the non-executive* [his co-mineral owners] *did not receive.* His taking one hundred percent of seven-eighths of the three producing wells, his taking one-half of the working interest, free and clear of costs, by his farm-out to Schero, was also the receipt of *special benefits that the non-executive did not receive* ... (Emphasis supplied.)

673 S.W.2d at 184.

The issue in *Comanche Land & Cattle Co.* was whether the holder of the executive rights violated a duty owed the owner of a term royalty interest. There, the plaintiffs conveyed the land to Comanche

Land and Cattle Co. by deed dated February 17, 1964, and reserved unto themselves for a period of twenty years from the date of the deed a one-half *royalty* interest on *all* royalties that might be paid during the term of the reserved interest. Thereafter, on March 13, 1976, Comanche Land and Cattle Co. entered into a joint venture mining agreement (which was held not to be a lease) with another business entity. The agreement explicitly provided that there is "no royalty" payable thereunder. Two producing gas wells were completed on the land. The trial court held that Comanche Land and Cattle Co., the owner of the executive rights, had purposely entered into an agreement that was calculated to defeat the rights of the royalty owners, and rendered judgment for damages for plaintiffs, the royalty owners. The Court of Appeals affirmed on the theory that Comanche Land and Cattle Co. had breached a fiduciary duty which it owed to the royalty owners, relying upon *Manges.*

The non-executive in the *Comanche Land & Cattle Co.* case, reserved a non-participating royalty interest in one-half of the royalties. Here, the non-executive reserved a stated fraction (1/32) of the minerals produced as a royalty. In *Comanche,* the executive could control the amount of production accruing to the royalty owner, and, thus, was in a position to manage and manipulate the share of production to which the non-executive would be entitled and could, by other provisions in a lease, obtain benefits that were not obtained by the non-executive. Such possibilities do not exist in the present case. In the event of production, Hope would receive a 1/64th free royalty, no more and no less, and this irrespective of who manages the lease or upon what terms were contained in a lease.

Neither the announcements nor holdings in *Manges* nor *Comanche* mandate that Pickens owed a fiduciary duty to Hope. Those cases are distinguishable on the facts from the instant case. The relationship between the holder of the executive rights in the mineral estate and the non-executives in those cases are entirely different from the relationship between Pickens and Hope in the present case.

We do not interpret *Manges* to hold that in every case the executive owes a fiduciary duty to the non-executive. As noted, there, the executive (Manges) and the non-executive (the Guerras) were co-tenants in the mineral estate, and the benefits which the Guerras received were totally dependent upon how Manges managed the entire mineral estate. Under the facts presented in *Manges,* a relationship of trust and confidence between the parties was established which gave rise to a fiduciary duty on the part of the executive. In the case at bar, there is no co-tenancy in the minerals, and the relationship is that of fee mineral owner and non-participating royalty owner; the relationship of trust and confidence simply does not exist.

The trial court refused to submit an instruction that an executive had a fiduciary duty and an instruction defining "fiduciary" as including a relation of trust and confidence. Hope does not complain of such refusal by a cross point.

■ A true fiduciary is bound to serve the primary interests of his principal and to subvert his own self-interests when they are in conflict. *See, e.g., Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377, 387–88 (1945). That relationship is not found here in the case of Pickens, who is charged with failure to lease or to develop his *own* property, who has *not* been entrusted with the executive management of royalties belonging to Hope, who has not taken any profits and benefits of any nature, and who has not engaged in self-dealing concerning the royalties owned by Hope.

The suggestion of fiduciary relationship was rejected in a recent case involving an alleged abuse of the pooling power by a lessee. In *Vela v. Pennzoil Producing Co.,* 723 S.W.2d 199 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.), the Fourth Court of Appeals, speaking through Judge Klingeman, at page 206 stated:

Although it has been said that the lessee has a fiduciary obligation in the exercise of the pooling power, it is submitted that the lessee is not a fiduciary and that such a standard is entirely too strict.

*This is so because the lessee has not undertaken to manage and develop the property for the sole benefit of the lessor.* The lessee has a substantial interest that must be taken into account, and it would not be required to subordinate its own interest to the interest of the lessor ... (Emphasis supplied.)

This analysis explains precisely why the breach found against Pickens was not the breach of a fiduciary duty. Pickens was not authorized to manage and develop the property for the sole benefit of another and hence no fiduciary relationship arose.

In *Texas Oil & Gas Corporation v. Hagen,* 31 Tex.Sup.Ct.J. 150 [1987 WL 47847] (Dec. 1987, joint motion of the parties granted in part, 31 Tex.Sup.Ct.J. 594, July 1988), the Court rejected the suggestion of a fiduciary standard in any oil and gas implied covenant lease. In doing so, the Court, speaking through Justice Gonzalez, said:

This court has never adopted a fiduciary or "highest good faith" or "utmost fair dealing" standard in any oil and gas implied covenant case. *To the contrary, we have specifically held that unless the lease document itself creates in law a trust, or unless a relationship of trust and confidence necessarily results from the lessor-lessee relationship, the standard of conduct of the lessee cannot be appropriately categorized as fiduciary. Manges v. Guerra,* 673 S.W.2d 180 (Tex.1984); *Sunac Petroleum Corp. v. Parkes,* 416 S.W.2d 798 (Tex.1967); *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966). (Emphasis supplied.)

*Consolidated Gas & Equipment Co. v. Thompson,* cited in *Hagen,* among other holdings, at page 336, holds:

... for a constructive trust to arise there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit ...

In *Sunac Petroleum Corporation v. Parkes,* also cited in *Hagen,* an owner of an overriding royalty interest sued the assignee of the lease alleging breach of a confidential relationship in the failure to renew the lease. The Court held that the reservation of an overriding royalty when a lease is assigned does not create any confidential or fiduciary relationship between the assignor and assignee. By analogy, the reservation of Hope's term non-participating royalty did not itself create a fiduciary relationship. The fact that a 1/64th term royalty owner is dependent upon the executive to manage the mineral estate in good faith does not of itself create a special relationship of trust and confidence.

Pickens as owner of 100% of the mineral estate is the executive as a matter of law, not because of a special relationship undertaken to manage the royalty belonging to another. By the court's instruction and by law, he does not owe a superior duty to the royalty owner, the hallmark of a fiduciary relationship. Specifically, the reservation of the term royalty in the deed did not mandate that Pickens would manage and develop the minerals for the sole benefit of Hope.

*Hagen* rejected the notion that *any* breach of a duty of good faith and fair dealing by a lessee becomes a tortious or fiduciary breach. Instead, the inquiry focuses on whether there is a relationship of trust and confidence.

The parties to a stated fractional non-participating royalty grant or reservation, as distinguished from a mineral grant or reservation, do not contemplate or intend the imposition of a fiduciary standard of conduct upon the executive. We hold that Pickens was not a fiduciary and did not owe such a duty to Hope.

The duty owed by the executive to the non-executive owner of a term non-participating royalty owner requires him to timely lease the land to another for mineral development, or to timely develop the minerals himself, if, during the term, it becomes reasonably apparent that minerals are under the land. The executive, in leasing the land, must act with reasonable regard for the interests of the non-participating royalty owner as a reasonably prudent *landowner* who owned all of the mineral

estate would have acted under the same or similar circumstances. Matters of cash bonus, primary term, delay rentals and special provisions are matters of trading, and as long as the executive acts in good faith and with reasonable regard for the interests of the non-participating royalty owner, his judgment in leasing or refusing to lease is not subject to question, and his refusal to lease, absent arbitrariness, connivance or deliberate action calculated to deprive the non-executive of his royalty interest, will not constitute a breach of duty owed the owner of the non-participating royalty. The duty to develop known minerals by the executive depends upon economics.

■ We now decide whether Pickens breached the duty of an ordinary, prudent landowner in failing to lease the ranch for the production of minerals. In this respect, there are two kinds of minerals to be considered: oil and gas, and tar. Concerning the former, there was a reasonable possibility of production of oil and gas; with respect to the latter, the production of tar was a certainty.

It is shown by the evidence that during the early 1980's Pickens did make efforts to lease the ranch to Winn for the production of oil and gas only, but the parties were unable to agree upon the terms. It is also established by the evidence that Pickens, in 1984, leased the ranch to Texas Tar Sands for the production of oil and gas only, and that the lessee drilled a dry hole on the premises. Accordingly, we hold that Pickens did not breach the standard of duty owed Hope of an ordinary, prudent landowner in failing to lease the ranch for the production of oil and gas.

■ Next, we determine whether Pickens breached a duty of good faith and utmost fair dealing in failing to lease the ranch to another for the production of tar, or to develop the tar himself. Neither party has cited a case involving the production of tar, and we have not found such a case.

It is conclusively shown by the evidence that there was a large deposit of tar underlying the ranch which, if upgraded and sold profitably, had a potential value of many millions of dollars. It is undisputed that Pickens made no effort to lease the ranch for the production of tar. There is no evidence that anyone, from 1974 until June 10, 1985, when the term royalty expired, offered to lease the ranch under a lease which would have granted the lessee the right to produce tar except General American, Southworth and Winn. General American's offer was rejected by Pickens on several grounds, which have already been set out. Those grounds were in the nature of "trading matters," and Pickens had reasonable cause to reject such offer. Moreover, the offer was made in 1974, which was before it became known that it was technically possible to produce tar in a marketable state. Concerning the offer by Southworth, the record does not reveal the terms of the lease other than a cash bonus was offered. Southworth was a participant in the Enpex/Syntaro project, which was abandoned prior to the termination of Hope's royalty. C.C. Winn, who controlled Winn Exploration Company, stated that neither he nor his company had the expertise or the money to develop the tar, but would have to depend upon "investors" to obtain the necessary finances for production. He did, however, say that he would have "gone after whatever there was in any formation" on the ranch if he had gotten a lease, and he speculated that he would have had no problem assembling the necessary capital and technical expertise in order to form a joint venture for the production of tar. We cannot from the evidence in this case infer that he would have produced tar had he obtained such a lease, and that such production would have continued beyond the expiration of the 20-year term. All others, who had expended millions of dollars in producing small amounts of tar, abandoned such operations prior to the expiration of the term royalty. Contrary to Hope's claims, neither Exxon, Conoco, nor Nucorp Energy offered to lease the ranch for tar development.

■ No duty on the part of a lessee to produce minerals underlying land exists unless it is proven that operations would yield a reasonable expectation of profit to the lessee. *Young v. Amoco Production Co.,*

610 F.Supp. 1479 (E.D.Tex.1985), aff'd, 786 F.2d 1161 (5th Cir.1986); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959); *Texas Pacific Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031 (1928); *Atlantic Richfield Co. v. Gruy*, 720 S.W.2d 121 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). In *Clifton v. Koontz*, the Supreme Court, at pages 695–696, quoted with approval from an earlier case the reasons for this rule, as follows:

> The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor results with them. *It is only to the end that oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required.* (Emphasis supplied.)

If Pickens had leased the property, his lessee would have been confronted with the same economic realities that confronted Conoco and Texas Tar Sands. Since a lessee would not have a duty to develop the tar sands when there was no reasonable expectation of profit, then it follows that Pickens was not under a duty to lease for development under the same conditions.

As all cases already cited show, it is well settled that in a lessor-lessee relationship, the standard of duty imposed upon the lessee concerning mineral development is that of a reasonably prudent operator. This equates to the ordinary prudent landowner standard which should be imposed upon the owner of the mineral estate in a mineral owner-royalty owner relationship where the mineral owner elects to develop the minerals himself. While the above cases involve the lessor-lessee situation, the same rule should apply with no less force to the relationship of a mineral fee owner and a non-participating royalty owner. Pickens, as he had a right to do, attempted the self-development of his own minerals. In that capacity, he had no greater duty than that of a reasonably prudent operator. A breach of that duty is no more than a breach of the implied covenant to reasonably develop the minerals.

It is conclusively shown by the undisputed evidence that development of the tar sands on the Chaney Lake Ranch and surrounding environs could never, during the term of Hope's royalty, be attempted with a reasonable expectation of profit. It would not matter who owned the right to conduct the mineral development, whether a landowner, an investor, a major oil company, or a combination of all in a joint venture. The production of tar was never economically feasible during any time from June 10, 1965 to June 19, 1985, the term of Hope's royalty.

Hope's contention that profit or loss is irrelevant to the receipt of royalty is without merit. There will be no royalty payments without production; and there will be no production by the mineral owner or anyone else without the reasonable expectation of profit.

Hope, as plaintiff, had the burden of proving that Pickens could have leased the ranch to another, who, during the term of his royalty, would have produced minerals, or that Pickens could have produced minerals himself, and that the failure to do either constituted a breach of good faith and utmost fair dealing. He did not meet that burden.

From 1981 forward, Pickens attempted to produce tar from the ranch by attempting a joint venture development, first with Conoco and then with Texas Tar Sands, Ltd. This effort was entirely consistent with the interest of Hope in obtaining the production of tar. However, all pilot production of tar ceased and were abandoned for economic reasons prior to the expiration of Hope's royalty interest on June 10, 1985. Pickens was most diligent in his efforts to obtain the production of tar before June 10, 1985, and had the U.S. Fuels Corporation granted the application for price support, it can be inferred that production of tar would have commenced before the term royalty expired and that eventually commercial production would have been estab-

lished, which would have extended the term royalty indefinitely.

On precisely the same evidence, the jury found that Pickens did not breach the duty of good faith and utmost fair dealing owed to Oil Field. No logical reason exists for the difference in the findings as to Hope and Oil Field.

There is no evidence that Pickens could have leased the ranch to another for the production of tar who would have produced tar, if lease had been obtained, during the term of Hope's royalty. It is conclusively shown by the evidence that tar could not have been produced by Pickens, or anyone else, with an expectation of profit during the term of Hope's royalty.

Considering only the evidence and inferences tending to support the jury's finding that Pickens breached a duty to Hope of good faith and utmost fair dealing by failing to lease the ranch to another for mineral development, or to develop the minerals himself, and disregarding all evidence and inferences to the contrary, we hold that there is no evidence that Pickens owed a fiduciary duty to Hope, or that he breached such duty; there is no evidence that Pickens breached the duty of an ordinary, prudent landowner in failing to lease the ranch to another for the production of tar; there is no evidence that Pickens breached the duty of an ordinary, prudent operator in failing to produce tar himself. Consequently, the jury's finding that Pickens breached the duty of "good faith and utmost fair dealing, by failing to lease or develop the oil, gas and other minerals under the Chaney Lake Ranch" has no support whatever in the evidence. Accordingly, Pickens' first point of error is sustained.

Our holding makes it unnecessary that we consider Pickens' remaining points of error. Hope, in two cross points, complains that the trial court erred in ordering a remittitur of $950,000 and in decreeing that interest would run on the judgment from the date the modified judgment was signed instead of the date the first judgment was signed. We disagree. The cross points have no merit and are overruled.

The judgment of the trial court is reversed, and judgment is here rendered that J.A. Hope, Jr., plaintiff in the trial court and appellee in this Court, take nothing in his action against John T. Pickens, defendant in the trial court and appellant in this Court.