02-10-369-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-10-00369-CV

 

 


 
 
 Betty Lou Bradshaw
  
  
  
 v.
  
  
 Steadfast Financial, L.L.C., R.J. Sikes, Roger Sikes,
 Kathy Sikes, Greg Louvier, Pam Louvier, Christy Rome, Dacota Investment
 Holdings, L.L.P., a/k/a Dacota Investment Holdings, L.P., Range Production I,
 L.P., Range Resources Corporation, Peter G. Bennis, Ronny D. Korb, and R. Crist
 Vial
 
 
 §
  
 §
  
 §
  
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 355th District Court
  
  
  
  
  
 of Hood County (C2007009)
  
  
  
 February 14, 2013
  
  
  
 Opinion by Justice McCoy
 
 


 

JUDGMENT

 

          This court has considered the record on
appeal in this case and holds that there was error in part of the trial court’s
judgment.  It is ordered that the judgment of the trial court is affirmed in
part and reversed in part.  We affirm that portion of the trial court’s
judgment that granted summary judgment for Peter G. Bennis and Ronny D. Korb. 
We reverse that portion of the trial court’s judgment that granted summary
judgment to Steadfast Financial, L.L.C., Range Production I, L.P., Range
Resources Corporation, R.J. Sikes, R. Crist Vial, Roger Sikes, Kathy Sikes, Greg
Louvier, Pam Louvier, Christy Rome, and Dacota Investment Holdings, L.L.P.
a/k/a Dacota Investment Holdings, L.P., and remand this case to the trial court
for further proceedings consistent with this opinion.

          It is further ordered that the parties shall
pay their own costs of this appeal, for which let execution issue.

 

SECOND DISTRICT COURT OF APPEALS


 

 

 

By_________________________________

    Justice Bob McCoy

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-10-00369-CV

 

 


 
 
 BETTY LOU BRADSHAW
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 STEADFAST FINANCIAL, L.L.C., R.J. SIKES, ROGER SIKES,
 KATHY SIKES, GREG LOUVIER, PAM LOUVIER, CHRISTY ROME, DACOTA INVESTMENT
 HOLDINGS, L.L.P. A/K/A DACOTA INVESTMENT HOLDINGS, L.P., RANGE PRODUCTION I,
 L.P., RANGE RESOURCES CORPORATION, PETER G. BENNIS, RONNY D. KORB, AND R.
 CRIST VIAL
 
 
  
 
 
 APPELLEES
 
 


 

                                                                                                                             

------------

 

FROM THE
355TH DISTRICT COURT OF HOOD COUNTY

 

------------

 

OPINION

 

------------

 

 

I.  Introduction

In four issues, Appellant Betty Lou Bradshaw appeals
the trial court’s summary judgments for Appellees Steadfast Financial, L.L.C.
(Steadfast); Range Resources Corporation and Range Production I, L.P. (collectively,
Range); R.J. Sikes, R. Crist Vial, Roger and Kathy Sikes, Greg and Pam Louvier,
Christy Rome, and Dacota Investment Holdings, L.L.P. a/k/a Dacota Investment
Holdings, L.P. (collectively, the Royalty Holders); Peter G. Bennis; and Ronny
D. Korb.  We affirm in part and reverse and remand in part.

II.  Factual and Procedural Background

A.    Prior Appeal

In a prior appeal involving these parties, we stated
the following:

Bradshaw is the holder of
a non-participating royalty interest (NPRI)[[1]]
in approximately 1,800 acres in Hood County that she inherited from her
parents, J.A. and Lota Fay Driskill.  The Driskills reserved the royalty
interest in two deeds that they executed in 1960 (the “1960 Deeds”).

By 2006, . . . Steadfast
owned the surface and mineral estates in approximately 1,994 acres in Hood
County, of which the Driskills’ reserved royalty interests covered 1,800
acres.  Steadfast conveyed the surface estate to . . . Range Resources
Corporation but reserved to itself all of the oil, gas, and other hydrocarbons
in the 1,994 acres.  At the same time, Steadfast entered into an oil and gas
lease covering the 1,994 acres with . . . Range Production I, L.P.; the lease
provided for a 1/8 royalty.  Steadfast assigned portions of its royalty
interest to . . . R.J. and Kathy Sikes, R. Crist Vial, [Greg and Pam] Louvier[],
and Dacota Investment Holdings, LLP.[[2]]

In January 2007, Bradshaw
filed suit, alleging that Steadfast breached its fiduciary duty to her by
entering into the one-eighth royalty lease with Range Production I, L.P., when
Steadfast owed her a duty to secure a one-fourth royalty in the lease.  Bradshaw
argued that she was entitled to a one-eighth royalty (1/2 of 1/4 lease
royalty), rather than a one-sixteenth royalty (1/2 of 1/8 lease royalty)
because, at the time Steadfast executed the lease to Range, the “going royalty
rate in Hood County, Texas, was one-fourth.”

The parties filed
competing motions for summary judgment on whether the 1960 Deeds reserved a “fraction
of royalty” or a “fractional royalty” interest.  Range argued that Bradshaw’s
NPRI was a fixed one-sixteenth “fractional royalty” (1/2 X 1/8) and, therefore,
no fiduciary duty was owed or breached.  Bradshaw contended that the 1960 Deeds
provided for a “fraction of royalty,” such that her share of royalty could
never drop below one-sixteenth but could be greater than one-sixteenth.  Thus, if
a future lease provided for a one-eighth royalty, she would get a one-sixteenth
(1/2 X 1/8) share of production; if it provided for a one-sixth royalty, she
would be entitled to a one-twelfth (1/2 X 1/6) share of production.

Range Res. Corp. v. Bradshaw (Bradshaw I), 266 S.W.3d 490, 491–92 (Tex. App.—Fort Worth 2008,
pet. denied) (op. on reh’g) (footnotes omitted).  The trial court agreed with
Bradshaw, holding that the royalty interest reserved in the 1960 Deeds was a “fraction
of royalty” interest, and we affirmed.  Id.

B.   Bradshaw’s Claims

In April 2010, Bradshaw filed her first amended
petition, renewing her argument that Steadfast, as the executive rights holder,
breached its duty to her in the manner in which it negotiated and structured
its April 27, 2006 transactions with Range by engaging in self-dealing,
obtaining an excessively large bonus payment and above-fair-market-value price
for the tract’s surface by structuring the lease to substantially reduce the lease
royalty reserved to one-eighth.  Bradshaw alleged that because of Steadfast’s
perfidy, she had received one-sixteenth less of the royalty that she should
have received, to her detriment, and that Range had conspired with Steadfast.

Bradshaw pleaded for a constructive trust on the
royalty interest assigned by Steadfast to Bennis and the Royalty Holders, along
with the portion of the royalty conveyed by Bennis to Korb; disgorgement by
Steadfast; actual damages against Steadfast and Range as jointly and severally
liable for Steadfast’s breach of duty; exemplary damages from Steadfast and
Range; reformation of the lease; and a decree setting aside and canceling
Steadfast’s transfers and conveyances of its royalty interest as fraudulent.  In
her second amended petition, Bradshaw sought to impose a constructive trust on
the accrued royalties and future payments of royalties to the NPRIs deeded by
Steadfast and clarified that she also sought to set aside the transfer from Bennis
to Korb as fraudulent.




 

C.   Summary Judgment Orders

On June 3, 2010, the trial court granted Bennis’s
no-evidence motion for summary judgment.  The trial court also granted Korb’s
traditional and no-evidence motion for summary judgment against Bradshaw “on
all grounds” on the same day.  The trial court granted summary judgment for
Steadfast and the Royalty Holders on their second motions for summary judgment
before granting a final summary judgment in August 2010.[3]

In its final judgment, the trial court stated that it
considered the following motions:  Range’s motion for summary judgment;
Steadfast’s third motion for summary judgment; the Royalty Holders’ third
motion for summary judgment; Bennis’s second motion for summary judgment;
Korb’s second traditional and no-evidence motion for summary judgment; and
Bradshaw’s motion for reconsideration.  It granted all but Bradshaw’s motion.  After
acknowledging that it had already signed orders granting Bennis’s, Korb’s,
Steadfast’s, and the Royalty Holders’ motions, the trial court found that all
of Bradshaw’s causes of action against these parties had been previously
dismissed by summary judgment and ordered that Bradshaw take nothing from any
of the appellees.  This appeal followed.




 

III.  Summary Judgment

Bradshaw argues that the trial court erred by granting
summary judgment for Steadfast, Range, the Royalty Holders, Bennis, and Korb.

A.  Standard of Review

We review a summary judgment de novo.  Travelers
Ins. Co. v. Joachim, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the
evidence presented in the light most favorable to the nonmovant, crediting
evidence favorable to the nonmovant if reasonable jurors could, and
disregarding evidence contrary to the nonmovant unless reasonable jurors could
not.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289
S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve
any doubts in the nonmovant’s favor.  20801, Inc. v. Parker, 249 S.W.3d
392, 399 (Tex. 2008).  A defendant who conclusively negates at least one
essential element of a cause of action is entitled to summary judgment on that
claim.  Frost Nat’l Bank v. Fernandez, 315 S.W.3d 494, 508 (Tex. 2010); see
Tex. R. Civ. P. 166a(b), (c).

B.  Steadfast’s Summary Judgment

1.    Steadfast’s Motion

In its second motion for summary judgment, Steadfast
argued that Bradshaw could not complain of breach of a duty to her because the
lease providing for a one-eighth royalty was specifically authorized by the
language of the deed reservation and that Bradshaw’s complaint was barred by
estoppel by deed.  To its motion, Steadfast attached the first request for
admissions from it and the Royalty Holders to Bradshaw, which contained as an
attachment the 1960 Deeds; Bradshaw’s responses to the first request for
admissions agreeing that her NPRI claim was under the 1960 Deeds; and an
affidavit from R.J. Sikes with a copy of the April 2006 contract of sale with
Range.

In his affidavit, R.J. Sikes stated that he was
Steadfast’s managing member during all relevant time periods, that on April 27,
2006, Steadfast closed on the real estate transaction with Wise Assets No. 2,
Inc. regarding the property at issue, and that Steadfast also closed with Range
on the same day, conveying the surface estate to Range Resources Corporation
and signing an oil and gas lease with Range Production.  R.J. Sikes also
claimed that Steadfast engaged in no self-dealing, conspiracy, or collusion in
negotiating and entering the transaction with Range at arm’s length and that
Steadfast took no overriding royalty interest, no oil payment, and no bonus
royalty.[4]

The April 2006 contract showed that Steadfast had sold
the property for $8,976,600 in cash, that Steadfast had contracted with Gary
Humphreys for an assignment of the contract that would allow the sale to go
through, and that Steadfast had agreed to lease all minerals for a $7,505 per
acre lease bonus and a 1/8 royalty.[5]
 It also reserved a 3% overriding royalty interest to be assigned by Range to
Jack Huff, Kyle Poulson, and Dustin Renfro.

2.    Bradshaw’s Response to Steadfast’s Second Motion

In her response to Steadfast’s motion, Bradshaw argued
that Steadfast could have obtained a 1/4 royalty but instead reserved only a
1/8 royalty in exchange for the higher bonus payment it received, thereby
breaching its duty to her.  Bradshaw attached to her response portions of
Bennis’s deposition, in which he explained how he and Humphreys became involved
by contracting to purchase the land at issue from Wise Asset No. 2 and how he
presented or spoke about the land to EXCO, Chesapeake Energy, EnCana, Peak
Energy, XTO, Devon Energy, Burlington Resources, and Quicksilver.  Bennis said
that Chesapeake made what he thought was a serious offer and that lease rates
at the time ranged from 1/8 to 1/4.  Bennis also said that Steadfast had been
willing to offer a $200,000 bonus and a 1/4 royalty rate on the NPRI that he
and Humphreys had planned to retain at the property’s sale, based on an April
12, 2006 email from David Shipman to Humphreys, but he said that the actual
lease Steadfast signed had been for a 1/8 royalty.

Bradshaw attached the assignments by Humphreys of his
interest in the contract covering the affected land, first to Texas Shepco, LP
and then to Steadfast.  R.J. Sikes signed the agreements, and Shipman &
Associates, P.L.L.C., which represented Texas Shepco and then Steadfast, issued
checks to the seller for nonrefundable option fees.  In an April 12,
2006 email from David Shipman that Humphreys forwarded to Bennis, Shipman
stated the following:

Steadfast is willing to
enter into a lease agreement with [Humphreys] and honor a lease agreement for
Bradshaw in the same amount in order for you to fulfill your fiduciary duty to
Bradshaw as the executive mineral estate interest.

Steadfast is willing
to offer a 25% [1/4] royalty interest lease agreement for your 1/16 mineral
estate and two hundred thousand as a bonus payment payable upon closing. 
Attorney’s [sic] for Steadfast and Range believe this is the best alternative
to avoid litigation regarding the Bradshaw interest.  [Emphasis added.]

In
his deposition, Bennis described the April 17, 2006 meeting that included R.J.
Sikes and several others:

[The contract] was set to
close, apparently, to—with Range Resources buying the whole thing or the
property and being the oil and gas company that would develop the minerals.

And I looked everyone in
the eye and said, [“]Guys, this just isn’t working.  Gary Humphreys and I were
supposed to get six and a quarter. . . .  I understand Gary’s in a little bit
of a pickle.  And I want to resolve this, but someone needs to give me some
royalty.[”]

And it didn’t go very
far, unfortunately.  The brokers didn’t have anything.  R.J. didn’t have
anything other than what he had offered to Gary, and I didn’t know who was
getting what at that point. . . .  I just knew that I should have been getting
two and a half percent fixed royalty.

And at that point, I
recall R.J. trying to come up with a way to—I don’t know if he added a very
small fraction of a royalty or something, but it got to 1.56, whatever that
interest was that’s in the agreement.

Bennis
said that he and Humphreys were in agreement and resolved everything in the
stipulation agreement, in which, on April 18, 2006, Steadfast agreed to convey
an undivided NPRI of 1.5625% to Bennis, and in an election pursuant to the
stipulation and amendment to the contract, Bennis agreed to accept $337,500
from Steadfast in addition to his royalty.  In an April 18, 2006 email, Bennis
told a third party, “Bottom line is that Range Resources is buying the whole
deal land and taking a lease . . . .  I was hoping for the Chesapeake deal but
[Humphreys] screwed up a perfectly great opportunity for us all.”

R.J.
Sikes signed for Steadfast on April 27, 2006, issuing to Bennis his royalty
deed for a 1.5625% NPRI after Bennis and Humphreys assigned all of their interests
under the land sale contract to Steadfast.  Bennis testified that he did not
know from whom the portion of royalty that he received had been taken but that
no one at the April 17, 2006 meeting had seemed willing to give up some of his
share.  Bennis later conveyed to Korb 1/8 of 1% of his NPRI.  Steadfast
conveyed 2.028125% of its royalty interest to R.J. Sikes, 1.659375% to R. Crist
Vial, 0.55% to Roger and Kathy Sikes, 0.25% to Greg and Pam Louvier, 0.10% to
Christy Rome, and 0.10% to Dacota Investment Holdings, LP.  Bradshaw’s evidence
also showed that Vial sent R.J. Sikes an undated letter acknowledging “if no
lease, then no bonus of $250,000.00 in hand.  (Note: None of which goes to
Bradshaw).”

Bradshaw
also attached several other 2006 lease agreements made in Hood County around
the same time that included a 1/4 royalty and the affidavit of a landman
working in the area in 2005 and 2006, who opined that the lease bonus paid to
Steadfast was excessively high and that the reservation of a 1/8 royalty in the
oil and gas lease between Steadfast and Range was artificially low.  And she
attached a 2005 fax to her from Chief Oil & Gas and from Collins and Young
LLC containing a stipulation and offering to “lease the Wise Asset # LP
interest for a 25% royalty which means [Bradshaw] will have a 12.5% net royalty
interest” in the land covered by her royalty interest reserved in the 1960s
Deeds.

Bradshaw argued that in light of the evidence set out
above, particularly offers of a 1/4 royalty before the April 27, 2006
transaction, Steadfast’s offer to Humphreys, the other oil and gas leases in
Hood County in 2006 at various times after the April 27 transaction, and the
2005 offer from Chief Oil & Gas, there was a genuine issue of material fact
as to whether Steadfast breached its duty to her because it could have obtained
a 1/4 royalty.

Bradshaw also claimed that with regard to the Royalty
Holders, review of the April 27, 2006 transactions revealed that the
transactions were inextricably intertwined and conditioned upon each other and
that all of the royalty interests assigned, beginning with Bennis’s, came
directly from the 1/16 (1/2 of overall 1/8) lease royalty reserved by Steadfast
to itself in its agreement with Range.  Bradshaw contended that Steadfast had
breached its duty to her and that she was therefore entitled to a greater share
of whatever royalty should have been reserved, which would cut into what
Steadfast could reserve to itself and then transfer to Bennis and the Royalty
Holders.

3.    Bradshaw’s First Issue

In part of her first issue, Bradshaw argues that the
trial court erred by granting summary judgment for Steadfast when Steadfast, as
the executive rights holder, owed a fiduciary duty or duty of utmost good faith
to her as an NPRI owner, and she contends that the summary judgment evidence
raises a genuine issue of material fact with regard to whether Steadfast
breached this duty and that the affirmative defense of estoppel by deed does
not apply because her position is not inconsistent with any grant in the deeds.
 Relying on National Plan Administrators, Inc. v. National Health Insurance
Co., 235 S.W.3d 695 (Tex. 2007), Steadfast responds that the parties to the
1960 Deeds limited the existence and extent of any duties owed under the common
law by specifying that any lease “shall provide for Royalty of not less than
one-eighth,” that it fulfilled this duty, that it owed Bradshaw nothing more,
and that Bradshaw’s complaint is barred by the affirmative defense of estoppel
by deed.

a.    Duty to NPRI Owner

We will begin our analysis with a review of National
Plan Administrators.  In that case, the supreme court addressed whether an
insurance company was owed a general fiduciary duty by the entity with which it
had contracted at arm’s length to perform third-party administrator duties for
its cancer insurance policies.  See id. at 697–98.  NPA, the
administrator, argued that it did not have a general fiduciary duty to the
insurer under the insurance code’s specific provisions, the insurance code’s
general structure, or the parties’ agreement and that the specific fiduciary
duties that it owed the insurer were limited by their agreement.  Id. at
699–700.

The court reviewed the general law pertaining to
fiduciary duties, stating that the existence of a fiduciary duty is a question
of law and that such duties are “imposed on parties to certain relationships
based on the special nature of the relationships,” before turning specifically
to agency relationships.  Id. at 700 (citations omitted).  The court
noted that in an agency relationship, all aspects of the relationship must be
considered when determining the nature of fiduciary duties flowing between the
parties and that, because “[u]nless otherwise provided by statute or law,
duties owed by an agent to his or her principal may be altered by agreement,”
the substance of the parties’ agreements must also be considered in determining
the scope of an agent’s fiduciary duty to its principal.  Id. at 700,
702–03.

After reviewing the insurance code, the court held
that neither the code nor its structure created a general fiduciary duty
applicable to third-party administrators.  Id. at 701.  The court then
considered the parties’ detailed agreement, which specified that NPA was an
independent contractor whose activities in administering and marketing
insurance products were not exclusive to the insurer, before declining to
impose a general fiduciary duty on NPA “when the parties expressly agreed that
[the administrator] could take actions that would be in violation of such a
duty.”  Id. at 703 (reiterating that the contract arose from an arm’s-length
business transaction, that the insurer was experienced in negotiating
agreements in the insurance industry and was represented by experienced
employees and counsel when it entered the agreement, and that the parties
agreed that NPA would act as the insurer’s agent only for specific purposes).

This insurance administrator case is not on-point when
compared to the extensive body of law specifically addressing the executive
right holder’s duty to nonexecutives.  See, e.g., Manges v. Guerra,
673 S.W.2d 180, 181, 183 (Tex. 1984) (op. on reh’g) (stating that the duty of
utmost good faith owed by an executive has been settled since 1937).  Therefore,
we will trace the development of this particular body of law in order to
determine what duty, if any, the executive rights holder owes to an NPRI owner.

(1) Development of the
Executive’s Duty—Schlittler to Manges (1937–1984).

We begin our review with Schlittler v. Smith, 128
Tex. 628, 101 S.W.2d 543 (1937), a deed construction case in which the
commission of appeals determined that the reservation at issue was an NPRI
before observing that as to the relationship between the executive rights holder
and the nonexecutive, “self-interest on the part of the grantee may be trusted
to protect the grantor as to the amount of royalty reserved.  Of course, there
should be the utmost fair dealing on the part of the grantee in this
regard.”  Id. at 544–45 (emphasis added).  The supreme court adopted the
opinion.  Id. at 545.

(a)  Implied Covenant Theory

The “utmost fair dealing” language entered the mineral
interest lexicon in Schlittler, but the basis for the duty of utmost
fair dealing was unclear.  In 1959, we concluded that the executive rights
holder’s duty to an NPRI owner arose from an implied covenant.  See Eternal
Cemetery Corp. v. Tammen, 324 S.W.2d 562, 564–65 (Tex. Civ. App.—Fort Worth
1959, writ ref’d n.r.e.); see also Kimsey v. Fore, 593 S.W.2d
107, 111 (Tex. Civ. App.—Beaumont 1979, writ ref’d n.r.e.); Portwood v.
Buckalew, 521 S.W.2d 904, 911 (Tex. Civ. App.—Tyler 1975, writ ref’d
n.r.e.).

Tammen
involved placement of a cemetery, which would have, at the time, prevented mineral
exploration and production.  324 S.W.2d at 564.  We stated that this would
render worthless any mineral interest as well as the appellees’ NPRI, thereby
entitling the appellees to an injunction.  Id.  We based our conclusion
on an implied contract between the parties owning respective interests in the
estates of land, including the surface, “to so exercise their respective rights
therein as to avoid injury to the rights of the other parties,” and we referenced
the definitive (at the time) article on NPRIs.  Id. at 564–65 (citing
Jones, 26 Tex. L. Rev. at 580, for the proposition that owners of respective
interests in land may owe affirmative duties to each other).

Jones’s 1948 NPRI article recognized the potential
legal underpinnings after Schlittler for the executive’s duty, noting,

It
seems clear that the Texas courts will not leave the royalty owner completely
at the mercy of the holder of the exclusive-leasing privilege.  However, the
authorities cited indicate that the law on the subject is in the formative
stage and has not yet developed to the point where a clear concept of the exact
nature of the relation and duties can be ascertained therefrom.  Some of the
cases indicate that a fiduciary standard of conduct will be required on the
theory that the relation of principal and agent or trustee and cestui que
trust exists. . . .  To apply the strict fiduciary standard applicable to
trustees or agents would do violence to the intention of the parties and to the
accepted trust and agency concepts.  On the other hand, there is ample basis
for the recognition of implied covenants.  The parties to a non-participating
royalty grant or reservation do not contemplate or intend the imposition of the
extremely strict fiduciary standard of conduct.  However, it will be
demonstrated that the royalty owner will not be fully protected if he must rely
entirely upon the ordinary principles of contract law requiring only ordinary
good faith, prudence, and diligence.  It is believed that the courts will
arrive at a compromise between the two extremes and develop a concept which
will, to some extent, partake of both theories, and, while recognizing certain
implied covenants, will require a standard of conduct in the satisfaction
thereof, which will approach, but not reach, the strict fiduciary standard:  It
is in this sense that the phrase, “utmost fair dealing,” is used herein
to denote the standard of conduct required to satisfy the various implied
covenants.

26 Tex. L. Rev. at 573–74.

In Portwood, over a
decade after Tammen, the Tyler court based its fiduciary duty finding on
an implied covenant, as well as on the parties’ circumstances, which involved a
cotenancy among family members.  521 S.W.2d at 911 (“[T]here is an implied
covenant arising from the partition deed that the appellant would use the utmost
fair dealing in executing oil and gas leases so as to protect the interest of
the appellee’s children.”).

Four years later, the Beaumont court in Kimsey
relied in part on Portwood.  593 S.W.2d at 111.  In Kimsey, a
jury found that the executive rights holder, aided and abetted by others
(including the lessees), failed to use utmost good faith and fair dealing and
effectively caused the loss of the NPRI owners’ rights under the term royalty
deed when the evidence showed, among other things, that the executive had
initially declined to lease until the outstanding term royalty terminated and
that once he signed a lease, he gave the operators instructions not to drill
until the month after the outstanding term royalty expired.  Id. at
108–09.  The jury had been instructed that “the duty to use utmost fair dealing
and diligence in the exercise of the exclusive-leasing privilege arises out of
a contractual relationship with the plaintiffs under implied covenants in the
non-participating term royalty deeds.”  Id. at 110 n.4.

After the trial court granted to the defendants a
judgment notwithstanding the verdict, the NPRI owners appealed, and the
Beaumont court reviewed the then-existing case law, including Portwood,
before stating, “We are satisfied that the test of utmost fair dealing is an
implied covenant arising from the royalty deed which is imposed upon the owners
of the executive right to lease.”  Id. at 111.  The court reasoned that
it was necessary to imply such a covenant “in order to give effect to and
effectuate the purpose of the contract as a whole,” and that the record in the
case was “a concrete illustration of the absolute necessity of such an implied
covenant.”  Id. at 112.  Therefore, at least until the supreme court’s
1984 opinion in Manges, the legal theory for the duty of utmost fair
dealing by the executive rights holder was based on an implied covenant to
protect the NPRI owner’s interest.

(b)  From Implied Covenant to Relationship

The supreme court took an intermediate step on the way
from an implied covenant to a duty based on the parties’ relationship thirty
years after Schlittler, when it elaborated upon the type of relationship
that exists between an NPRI owner and the executive rights holder in Andretta
v. West, 415 S.W.2d 638 (Tex. 1967).  In Andretta, West conveyed an
undivided 1/4 NPRI to Andretta’s predecessor in 1942, after he had executed a
lease on his property but before he amended the lease in 1944 to provide for a
substitute royalty payment in lieu of the actual royalty covered by the lease. 
Id. at 639–41.  Andretta did not learn of the amendment or payments to
West until around 1957.  Id. at 639.  The court found that as to West
and Andretta, there was both privity of contract and a confidential
relationship between the parties necessary to hold West accountable for the 1/4
of compensatory royalty payments to which Andretta was entitled, reasoning as
follows:

The holder of the executive right has the
power to make and amend leases affecting the enjoyment of a non-participating
royalty interest owned by another.  It was in the exercise of such power that
respondents amended the lease to provide that the same might be maintained by
the payment to them of the full compensatory royalty.  The owner of a
non-participating royalty interest would not ordinarily learn of such an
arrangement unless he was advised by one of the parties.  When we consider
the power entrusted to respondents and their superior knowledge, it is clear to
us that they were in a confidential relationship with petitioner in so far as
the lease amendment and the payments thereunder are concerned.

Id. at 641 (emphasis
added).  That is, based on the terms of the deed and the existence of the lease
at the time the NPRI was granted to him, Andretta was entitled to share in the
compensatory royalty payments made to West, the executive rights holder.  Id.;
see also HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888 (Tex.
1998) (stating that in Andretta, the court held that a fiduciary
relationship existed between the executive rights owner and NPRI owners in
Andretta’s position because the former had the power to make and amend the
lease, thereby affecting the latter’s rights).  And a year before the court
handed down Manges, Justice Spears noted in a concurring opinion that
Texas courts have read a duty of good faith and fair dealing into many types of
contractually based transactions, with the common thread being that there is a
special relationship between the parties arising either from the element of
trust necessary to accomplish the goals of the undertaking or imposed by the
court because of an imbalance of bargaining power.  English v. Fischer,
660 S.W.2d 521, 524 (Tex. 1983) (Spears, J., concurring).  Justice Spears cited
Schlittler for the proposition that the executive rights holder owes a
duty of utmost fair dealing to the holder of a royalty interest, stating that
this duty arises from the relationship and not from the contract.  Id.
at 524–25.  Thus, as of 1983, the supreme court began moving in the direction
of the relationship between the parties rather than an implied covenant.

(c) Relationship Theory

In Manges, the supreme court’s quixotic,
groundbreaking 1984 case, the Guerra family sued Manges both for failing to
exercise diligence in leasing the minerals to third persons and for leasing a
portion of the minerals to himself at terms unfair to the Guerras.[6]
 673 S.W.2d at 181.  The court described the duty owed by the executive as
follows:

The duty of utmost good
faith owed by an executive has been settled since Schlittler v. Smith,
128 Tex. 628, 101 S.W.2d 543, 545 (1937).  That standard has been repeated in First
National Bank of Snyder v. Evans, 169 S.W.2d 754, 757 (Tex. Civ. App.—Eastland
1943, writ ref’d); Kimsey v. Fore, 593 S.W.2d 107, 111 (Tex. Civ.
App.—Beaumont 1980, writ ref’d n.r.e.); Portwood v. Buckalew, 521 S.W.2d
904, 911 (Tex. Civ. App.—Tyler 1975, writ ref’d n.r.e.); and Morriss v.
First National Bank of Mission, 249 S.W.2d 269, 276 (Tex. Civ. App.—San
Antonio 1952, writ ref’d n.r.e.).  The fiduciary duty arises from the
relationship of the parties and not from the contract. See English v. Fischer,
660 S.W.2d 521, 524–25 (Tex. 1983) (Spears, J., concurring).  While a
contract or deed may create the relationship, the duty of the executive arises
from the relationship and not from express or implied terms of the contract or
deed.  That duty requires the holder of the executive right, Manges in this
case, to acquire for the non-executive every benefit that he exacts for
himself.  R. Hemingway, The Law of Oil & Gas, § 2.2(D) (2d ed. 1983).

In our opinion Manges’
conduct amounted to a breach of his fiduciary duty as found by the jury in
making the lease to himself, in agreeing upon a $5 nominal bonus for 25,911.62
acres of land, and in dealing with the entire mineral interest so that he
received benefits that the non-executives did not receive.  His taking one
hundred percent of seven-eighths of the three producing wells, his taking
one-half of the working interest, free and clear of costs, by his farm-out to
Schero, was also the receipt of special benefits that the non-executives did
not receive.  Upon the basis of his receipt of special benefits, we must cancel
the lease as we did in State v. Standard, 414 S.W.2d 148 (Tex. 1967). In
Standard we held that the surface owner, as the exclusive agent for the
state in the execution of an oil and gas lease under the Relinquishment Act,
could not reserve the right to acquire for himself at a later time a
one-sixteenth share of the working interest, when the state was not accorded an
equal right.  Id. at 153.  The Manges-to-Manges lease was correctly
cancelled.

Id. at 183–84
(emphasis added).  The court held that Manges’s conduct amounted to a breach of
his “fiduciary” duty, as previously found by a jury.  Id. at 184. 
However, despite the court’s relatively clear language, defining the
executive’s duty post-Manges has presented a conundrum because of the
Guerras’ status as co-tenants with Manges—a point that both Steadfast and Range
rely upon in their appellate briefs before us.  See id. at 181.

(2) Refinement of the
Duty Post-Manges, 1985–2003

After Manges, the Texas intermediate appellate
courts focused to varying degrees on the relationship between the parties and
the terms of the deed reservations.  See Hlavinka v. Hancock, 116
S.W.3d 412 (Tex. App.—Corpus Christi 2003, pet. denied), disapproved of by Lesley
v. Veterans Land Bd. of the State of Tex., 352 S.W.3d 479, 491 & n.78,
492 (Tex. 2011); Luecke v. Wallace, 951 S.W.2d 267 (Tex. App.—Austin
1997, no writ); Dearing, Inc. v. Spiller, 824 S.W.2d 728 (Tex. App.—Fort
Worth 1992, writ denied); Mims v. Beall, 810 S.W.2d 876 (Tex.
App.—Texarkana 1991, no writ); Hawkins v. Twin Montana, Inc., 810 S.W.2d
441 (Tex. App.—Fort Worth 1991, no writ) (op. on reh’g); Pickens v. Hope,
764 S.W.2d 256 (Tex. App.—San Antonio 1988, writ denied); Comanche Land
& Cattle Co. v. Adams, 688 S.W.2d 914 (Tex. App.—Eastland 1985, no
writ).  Comanche, Pickens, and Mims have provided the
framework for the law as it has evolved in the intermediate courts, so we begin
our analysis with these cases.

The Eastland court cited to Manges in Comanche
when addressing whether the executive rights owner had violated a duty to the
term NPRI owner.  688 S.W.2d at 915–16.  The NPRI owner had reserved a 1/2 term
royalty interest when he conveyed his land to Comanche.  Id. at 915. 
When Comanche subsequently entered into a mining agreement that provided for no
royalty—defeating the NPRI owner’s rights—the court held that even though the
mining agreement was not a “lease,” this did not relieve Comanche of its duty
of utmost good faith when the evidence showed that before the mining agreement
was signed, Comanche had notice of the royalty reservation and could have
entered into an oil and gas lease containing a royalty provision.  Id.
at 915–16.

More cautiously, in Pickens, the San Antonio
court also addressed the duty owed by an executive rights holder to an NPRI
owner, noting that “some kind of duty” is owed by the executive but that “there
may be a variance concerning the standard to which the executive will be held
in the exercise of his executive right.”  764 S.W.2d at 257–58, 263–64.  In Pickens,
Hope’s parents had reserved a term royalty providing for “an undivided 1/4 of
the usual 1/8 royalty” when they conveyed the land to Pickens.  Id. at
258–59.  Pickens did not execute a lease until after Hope’s royalty term had
expired, after he had refused some offers to lease,[7]
and a jury found that he had breached his duty of good faith and utmost fair
dealing by failing to lease or develop the oil, gas, and other minerals.  Id.
at 259–60, 264.

On appeal, the parties disputed whether the standard
of duty owed to the NPRI owner should be measured by a fiduciary duty arising
from the parties’ relationship under Manges or by the breach of an
implied covenant arising out of the deed as held by the courts prior to Manges,
and whether the standard to be imposed should be (1) fiduciary, (2) good faith
and utmost fair dealing, or (3) ordinary care and good faith.  Id.
at 258.  The trial court had refused to give a fiduciary duty instruction and
instead instructed the jury that the executive rights owner owed to the NPRI
owner “the same degree of diligence and discretion in exercising the
[executive] rights . . . as would be expected of the average land owner”
motivated to take affirmative steps to seek or cooperate in leasing or
development due to self-interest.  Id. at 264, 267.  The trial court
instructed the jury that “[i]n the exercise of the executive rights, the holder
thereof has a duty to use utmost good faith and fair dealing as to the interest
of the non-participating royalty owner,” and it defined “utmost fair dealing” as

the same degree of diligence and
discretion in exercising the rights and powers held by the executive owner as
would be utilized by the average landowner seeking to obtain all the benefits
that could be reasonably obtained for himself and for his non-participating
royalty owner from a disinterested third party either (1) by leasing such lands
for exploration or (2) developing such lands himself.

Id.

In concluding that Pickens did not owe Hope a “fiduciary”
duty under Manges, the appellate court distinguished Manges on
the basis of cotenancy and Manges’s self-dealing.  Id. at 266.  It
distinguished Comanche based on that case’s specific NPRI reservation (a
one-half royalty interest on all royalties that might be paid during the term
of the reserved interest), as compared to the stated fractional NPRI reserved
by Hope’s parents.  Id. at 267–68.  The court reasoned that whereas in Comanche,
the executive could control the amount of production accruing to the royalty
owner and so was in a position to manage and manipulate the share of production
to which the non-executive would be entitled and could, by other provisions in
the lease, obtain benefits that were not obtained by the non-executive, none of
those possibilities existed as to Hope.  Id. at 267.  Hope’s parents had
reserved a stated fraction (1/32) as royalty, and “[i]n the event of
production, Hope would receive a 1/64th free royalty, no more and no less, and
this irrespective of who manages the lease or upon what terms were contained in
a lease.”  Id.

The court stated,

We do not interpret Manges
to hold that in every case the executive owes a fiduciary duty to the
non-executive.  As noted, there, the executive (Manges) and the non-executive
(the Guerras) were co-tenants in the mineral estate, and the benefits which the
Guerras received were totally dependent upon how Manges managed the entire
mineral estate.  Under the facts presented in Manges, a relationship of
trust and confidence between the parties was established which gave rise to a
fiduciary duty on the part of the executive.  In the case at bar, there is no
co-tenancy in the minerals, and the relationship is that of fee mineral owner
and non-participating royalty owner; the relationship of trust and confidence
simply does not exist.

. . . .

A true fiduciary is bound
to serve the primary interests of his principal and to subvert his own
self-interests when they are in conflict.  That relationship is not found here
in the case of Pickens, who is charged with failure to lease or to develop his own
property, who has not been entrusted with the executive management of
royalties belonging to Hope, who has not taken any profits and benefits of any
nature, and who has not engaged in self-dealing concerning the royalties owned
by Hope.

Id.
(citation omitted).  The court concluded that as to Pickens, the proper
standard was that of an ordinary, prudent landowner; that matters of cash
bonus, primary term, delay rentals, and special provisions were matters of
trading; and that

as long as the executive acts in good
faith and with reasonable regard for the interests of the non-participating
royalty owner, his judgment in leasing or refusing to lease is not subject to
question, and his refusal to lease, absent arbitrariness, connivance or
deliberate action calculated to deprive the non-executive of his royalty
interest, will not constitute a breach of duty owed the owner of the
non-participating royalty.

Id. at
268–69;[8]
see also Marathon Oil Co. v. Moye, 893 S.W.2d 585, 591 (Tex. App.—Dallas
1994, orig. proceeding) (op. on reh’g) (relying on Pickens but without
setting out terms creating NPRI).  But cf. Grinnell v. Munson,
137 S.W.3d 706, 719 (Tex. App.—San Antonio 2004, no pet.) (acknowledging that
“[t]he fiduciary duty owed by the holder of the executive right is to acquire
for the non-executive every benefit that he exacts for himself.”).

Finally, in Mims, the Texarkana court relied on
the terms of the deed to determine what level of duty was owed to the NPRI
holder.  810 S.W.2d at 879.  The Bealls reserved an undivided 1/4 NPRI when
they sold their land to John Mims.  Id. at 878.  The specific interest
reserved was for “1/4 of whatever royalty is obtained and no less than 1/8.”  Id.
at 879.

John’s son Angus leased the minerals from John for a
1/8 royalty without cash bonus and then assigned the lease to Henderson Clay
Products, Inc. in return for a 1/16 overriding royalty on the leasehold
estate.  Id. at 878.  There was no negotiation between Angus and his
father for the amount of the royalty, and John’s testimony “indicate[d] that
there was no arm’s length transaction because he was willing to give it to his
son if his son could get something out of it.”  Id. at 880.  The Bealls
sued, complaining that the 1/8 royalty was unreasonably low, constituting a
breach of duty, and that Angus’s overriding royalty interest was proof of the
breach.  Id. at 878.  The jury found a breach of the duty of good faith
and utmost fair dealing and awarded actual and exemplary damages for the
Bealls, and the trial court entered judgment on the verdict and imposed a
constructive trust on 1/4 of the 1/16 overriding royalty obtained by Angus
through assignment of the lease.  Id. at 878, 879.

The Texarkana court summarized the evolution of the
law from Schlittler (setting out the duty of utmost good faith and fair
dealing) and Manges (equating the utmost good faith standard with a
fiduciary obligation) to Pickens (stating no duty to manage NPRI when a
fractional royalty is involved) and Comanche (following Manges
when the NPRI was a fraction of royalty).  Id. at 878–79.  It
distinguished Pickens and analogized to Comanche on the basis of
the Bealls’ grant—no specific amount of royalty, but rather “1/4 of whatever
royalty is obtained and no less than 1/8,” leaving the percentage up to the
executive’s efforts—before concluding that although the NPRI owners in Manges
were also cotenants with Manges,

[t]he fact that the
non-participating interest owners were cotenants of Manges did not create a
fiduciary relationship in the absence of an agreement or contract providing for
such.  The significant relationship which gives rise to the fiduciary duty is
the exercise of the executive rights over the non-participating interest.  This
fiduciary duty should apply when the executive controls only the amount of the
royalty interest just as it does when the executive controls both the amount of
the royalty interest and the bonus and delay rentals.

In Manges, the
court held that the fiduciary duty is owed only in the area of the executive
interest owner’s duty to obtain appropriate benefits for the non-participating
royalty holders.  Furthermore, in Manges, the Supreme Court does not
apply the customary standard that the fiduciary must subordinate its own
interest to those of the non-participating interest owner, but instead charges
the fiduciary with acquiring for the non-executive every benefit that he exacts
for himself.

Id. at 879 (emphasis added) (citations omitted) (footnotes omitted).

The court concluded that evidence of John and Angus’s
conduct showed self-dealing and conspiracy to violate the fiduciary duty.  Id.
at 881–82.  The court noted that when a lessee maintains an arm’s length
position in the transaction, he does not owe a fiduciary duty or duty of utmost
good faith to the NPRI owner, but if he agrees with the executive “to an
arrangement made for the purpose of excluding or minimizing the benefits of an
outstanding or non-participating interest owner, the lessee can be held liable
to the injured third party.”  Id. at 880–81.  So while Angus, as a
lessee, did not owe a fiduciary duty to the Bealls, he could be held liable to
them as “a lessee who induce[d] or participate[d] in the executive’s breach.”  Id.
at 880.  The court upheld the trial court’s judgment after reforming the total
amount of actual damages.  Id. at 882.

From these three cases, two new schools of thought
began to emerge—one relying on the existence of cotenancy to support the existence
of a fiduciary duty and the other resting primarily on the terms of the
reservation itself and the exercise of the executive right.  Under both
theories, self-dealing appeared essential to find a breach of whatever duty was
owed, and “fiduciary” did not necessarily mean fiduciary in the traditional
agent-principal sense.

(a)  Cotenancy

In Hlavinka, a 2003 Corpus Christi case,
Hancock and the other appellees, who were nonexecutive cotenant mineral
interest owners, sued Hlavinka, a cotenant mineral owner and owner of the
executive rights and the surface, for breach of fiduciary duty.  116 S.W.3d at
415.  The basis for their suit was that when Hlavinka was approached about
leasing, he held out for more because nearby properties were receiving both higher
bonuses and higher royalty interests.  Id. at 415–16.  The court held
that although Hlavinka owed Hancock and the other appellees a duty to acquire
every benefit for them as he would acquire for himself, there was no breach
here because there was no self-dealing, unlike in Manges, and Hlavinka
did not withhold or fail to share money belonging to Hancock and the other
appellees as cotenants in the mineral estate.  Id. at 418–20.  In a footnote,
the court explained that

[u]ntil Manges, the utmost-good-faith
standard had not been considered to create a fiduciary duty.  See Mims v.
Beall, 810 S.W.2d 876, 878 (Tex. App.—Texarkana 1991, no writ).  Cases
interpreting the Manges decision have concluded that when the executive
and non-executive are co-tenants in the mineral estate and there is a
relationship of trust and confidence between the parties, a fiduciary
relationship exists between the executive and the non-executive mineral
interest owner.  See Marathon Oil Co. v. Moye, 893 S.W.2d 585, 591 (Tex.
App.—Dallas 1994, orig. proceeding); Pickens v. Hope, 764 S.W.2d 256,
267 (Tex. App.—San Antonio 1988, writ denied).

Id. at 417
n.3.

(b) Terms of Deed
Reservation

We addressed the issue, first in Hawkins in
1991 and then in Dearing in 1992, ultimately concluding that whether the
parties were cotenants was irrelevant.  Instead, we focused on the terms of the
NPRI reservation to define the duty owed by the executive rights holder.

In Hawkins, the appellees, royalty owners,
sought appointment of a receiver to enter into an oil and gas lease.  810
S.W.2d at 443, 445.  After the appellees filed suit, but before the
trial court could appoint a receiver, the appellant (who owned the surface, the
executive right, and the right to receive all bonus and delay rentals) executed
a lease with L.F. Jones Company.  Id.  The appellees argued that the
appellant’s executing this lease amounted to a breach of fiduciary duty because
the appellant had executed it after refusing a better lease offer by Twin
Montana.[9] 
Id. at 445. The trial court found that the Jones lease failed to
adequately protect the appellees and that the appellant had breached his
fiduciary duty by entering into such a lease and appointed a receiver.  Id.

With regard to the application of Manges, we
stated:

The Texas Supreme Court has held that a
fiduciary relationship exists between the owner of the executive right and the
royalty owner.  Manges v. Guerra, 673 S.W.2d 180, 183 (Tex. 1984).
Further, the executive owner owes a duty of utmost good faith to the royalty owner.
 Id.  Appellants argue that courts and commentators have criticized the Manges
decision.  We do not need to consider this controversy because the action of
the trial court was justified by the imposition of a duty of good faith.  See
Note, Manges v. Guerra: The Executive Right Holder Undergoes Close Scrutiny,
38 BAYLOR L. REV. 189, 194 (1986) (imposition of strict standard of utmost good
faith not required under the facts of Manges or other cases concerning
the executive owner’s duty).  Appellants do not have a duty to sacrifice their
desire to protect the surface of the land, and they would be entitled to
negotiate the best surface protection possible as long as they maintained good
faith in their consideration of the royalty owners.  The Jones lease contains a
more generous payment for surface damage, but we cannot say the trial court
erred in holding appellants were not acting in good faith when they accepted a
one-eighth royalty instead of a one-fourth royalty.

Id. at 445–46
(emphasis added).  Further, we held that although the appellant executed a
lease with a 1/8 royalty, the deed containing the NPRI grant stated that any
lease executed “shall always provide for a royalty of at least 1/8,” and
that “[c]ircumstances may require more than the minimum provided, to be acting
in good faith.”  Id. at 446.

In Dearing, the Haag family conveyed a 600-acre
tract to Dearing in 1943 but reserved an undivided 1/2 interest in minerals,
granted the executive right to Dearing, and provided that the royalty reserved
was “no . . . less than the usual one eighth (1/8) royalty.”  824 S.W.2d at
730.  In 1944, Dearing entered into an oil and gas lease providing for a 1/8
royalty; this lease did not expire until the early 1980s.  Id.  Dearing
then received several offers to lease the property, including an offer for a
1/4 royalty and bonus payments of $100/acre.  Id. at 731.  Dearing
ultimately leased to a company related to himself for a 1/8 royalty and no
bonuses.  Id.

Spiller, the Haags’ successor in interest, sued for breach
of the duty of utmost good faith, cancellation of the lease, termination of
Dearing’s executive leasing rights over Spiller’s mineral interests, and for an
accounting of the profits made under the lease.  Id. at 730–31.  The
jury found breach of the duty of utmost good faith and found that the lease was
an act of self-dealing and that Dearing and the related company conspired to
deprive Spiller of benefits he would have received in a lease to a
disinterested party.  Id. at 731.  It assessed $300,000 in exemplary
damages against each defendant.  Id.  The trial court’s judgment on the
verdict provided for cancellation of the lease, cancellation of Dearing’s
executive rights over Spiller’s mineral interest, and establishment of Spiller
as cotenant with Dearing with respect to the production on the premises, as
well as an accounting.  Id.

We held that the Manges standard of “utmost
good faith” applied and observed that although Dearing claimed that the “facts
in Manges v. Guerra are thousands of miles or light years removed from
the facts of the instant case,” it would be difficult to determine how a fact
situation could actually be more analogous to the first cause of action in Manges. 
Id. at 732.  We did not rely on the cotenancy factor but rather on the
limitation on the executive right in the language of the reservations in both Manges
and Dearing that no lease could be entered into that provided for less
than a 1/8 royalty.  Id.  When “at least two parties made offers substantially
better than the lease entered into by Dearing,” the trial court properly
entered judgment on the jury’s verdict that Dearing had breached his duty of
utmost good faith by entering into a lease with an “inside” party.  Id. 
Our reasoning was as follows:

Because the
non-participating royalty owner must depend upon the mineral fee owner for the
enjoyment of his interests, the courts have implied a covenant of utmost fair
dealing in the exercise of the executive rights to lease or develop the
minerals.

A mineral fee owner has a
possessory estate in the land.  As such he has the exclusive power to lease the
land to another for mineral development or to develop the minerals himself.  On
the other hand, a non-participating royalty owner has no possessory estate in
the land, and hence, no right to lease the land to another for mineral
development, nor does he have the right to produce the minerals himself.

In Pickens v. Hope,
764 S.W.2d 256 (Tex. App.—San Antonio 1988, writ denied), the court of appeals
distinguished Manges on the basis that in Pickens there was no
duty to manage the non-participating royalty interest because the amount of
that royalty was specifically set out as 1/4 and could not be altered.[[10]] 
However, in Manges, the executive rights holder had a duty to manage the
interest by obtaining the highest royalty possible and was prohibited from
self-dealing.  The court reached this determination from the language of the
deed which specified that no royalty less than 1/8 was acceptable.[[11]]
  Unlike Pickens, the present lease [sic] does not have or require a
fixed royalty.  Instead, it contains the Manges language calling for a
royalty of no less than 1/8.  Thus, the entire percentage return is left to the
efforts of the executive.  We hold that as the language in the Haag/Dearing
deed is the same as the language in the Manges deed, Dearing had a duty
to manage the executive interest by obtaining the highest royalty possible, and
was likewise prohibited from self-dealing.  Consequently, we hold that this
duty was breached when the lease he awarded himself did not provide for at
least the fair market royalty prevalent in the surrounding area at that time.

Id. at
732–33.

We also analogized to Comanche before stating
that the fact that the NPRI owners were cotenants in Manges did not
create the fiduciary relationship in the absence of an agreement or contract
providing such—instead, “the significant relationship which gives rise to the
fiduciary duty is the exercise of the executive rights over the
non-participating interest.”  Id. at 733.  “The fact that Dearing was
co-tenant with the plaintiffs is irrelevant to a determination of the duty owed
by an executive.  If Dearing owned no interest in the land, and only owned the
executive rights on the property, this duty would still be imposed.”  Id.;
see also Mafrige v. United States, 893 F. Supp. 691, 703 (S.D. Tex.
1995) (citing Dearing, Mims, and Comanche for the
proposition that the lower Texas courts since Manges have found a
fiduciary obligation whenever the amounts due on the NPRI are linked to the
royalty negotiated by the holder of the executive interest instead of a fixed
fractional amount in the deed), aff’d, 189 F.3d 466 (5th Cir. 1999), cert.
denied, 529 U.S. 1053 (2000); Joshua M. Morse III
and Jaimie A. Ross, New Remedies for Executive Duty Breaches:  The Courts
Should Throw J.R. Ewing Out of the Oil Patch, 40 Ala. L. Rev. 187, 199
(1988) (“Where executives have power to increase their bonuses, surface damage
payments, or other interests by decreasing the royalty interest, they have the
power to diminish significantly the value of nonparticipating royalty
interests.” (footnote omitted)).

In an article we also referenced in Bradshaw I,
see 266 S.W.3d at 493, Phillip E. Norvell made a similar observation
after referencing Dearing, Mims, Pickens, and Comanche,
concluding that the amount of the executive’s control over the lease benefits
is determinative as to whether the Manges fiduciary standard applies and
that it applies to a mineral owner with the executive right when a fraction of nonparticipating
royalty is involved, in contrast to the “utmost fair dealing” standard, which
would apply to a fractional NPRI.  Phillip E. Norvell, Pitfalls in
Developing Lands Burdened by Non-Participating Royalty:  Calculating the
Royalty Share and Coexisting with the Duty owed to the Non-Participating
Royalty Owner by the Executive Interest, 48 Ark. L. Rev. 933, 981–82 &
n.116 (1995).  But see id. at 982 n.118 (“The question remains
unanswered as to whether the fiduciary standard of Manges requires the
executive to exact for the non-executive the highest royalty obtainable.”). 
The basis for this position is due to

[t]he problem that peculiarly haunts
non-participating royalty interests to a fraction of royalty[:] . . . [T]he
[NPRI fraction of royalty] owners do not participate in the leasing of the land
which determines the quantum of lease royalty that they will receive from
production.  The owner of the executive right to the mineral estate negotiates
and executes the oil and gas lease which fixes the amount of bonus, delay
rentals and royalty to be paid under the lease.  Thus, absent a judicial
standard regulating the conduct owed by the owner of the executive right to the
non-participating royalty owner, the latter would be at the mercy of the former
as to the share of royalty received under the lease.

Id. at
972–73 (emphasis added) (footnotes omitted) (noting that the evolution of the
standard of care imposed on the executive right holder “has not been uniform or
without controversy”).

(c) Self-Dealing

The presence or absence of evidence of self-dealing by
the executive rights holder plays a role under both the cotenancy and
terms-of-the-deed theories.  One of the most clear cut examples of self-dealing
is a 1997 Austin case, Luecke v. Wallace.  In Luecke, Wallace
reserved an undivided 1/2 NPRI and an undivided 1/2 interest in any bonus money
exceeding $50 per acre when she conveyed the rest of her interest in a 303-acre
tract to Luecke’s predecessor.  951 S.W.2d at 270.  Luecke’s deed was made expressly
subject to Wallace’s reservation.  Id. at 271.

Luecke initially negotiated an agreement to lease the
tract after Union Pacific offered him a 1/5 royalty and $150/acre bonus.  Id. 
When Union Pacific found Wallace’s reservation during a title search, it told
Luecke that he had to provide Union Pacific with evidence of payment of 1/2 of
excess bonus money above $50 per acre and a ratification and rental division
order setting forth the interest division.  Id.  Instead, Luecke leased
the tract to Tex-Lee, a company that he was the president and sole owner of,
for 1/8 royalty and less than $50 per acre bonus.  Id.  Tex-Lee then
sold its lease to Union Pacific for the $150-acre bonus and an overriding 1/5
royalty.  Id.  Although Luecke orally represented to Union Pacific that
Wallace was “on board” with the lease, Wallace did not know anything about it. 
Id.

After Wallace sued Luecke for breach of fiduciary
duty, the trial court granted Wallace’s two motions for partial summary
judgment, finding that she was an NPRI owner, that Luecke held the executive
rights when he executed the lease, that Luecke owed Wallace a duty to obtain
for her every benefit that he obtained for himself or his wholly owned
corporation Tex-Lee, and that Wallace was entitled to her share of the
additional royalty.  Id. at 271–72.  The trial court then held a trial
on the merits to determine damages.  Id. at 272.

In affirming the trial court’s judgment, the Austin
court relied on Manges to reason as follows:

Luecke and Tex-Lee argue
that, to establish a breach of this duty on summary judgment, Wallace would
have had to establish that she could have made a better deal than the
one-eighth royalty and the less than fifty dollar per acre bonus that Luecke
received from Tex-Lee.  We disagree.  Wallace only needed to establish that
Luecke obtained benefits for himself that he did not obtain for Wallace.  The
undisputed summary judgment evidence establishes the following: (1) Union Pacific
offered to lease the 303-acre tract from Luecke for a one-fifth royalty and
$150 per acre bonus; (2) Luecke restructured the transaction so that Tex-Lee
would receive the $150 per acre bonus and one-fifth royalty and Luecke individually
would only receive from Tex-Lee a one-eighth royalty and less than $50 per acre
bonus; and (3) Luecke received from Tex-Lee all of the bonus money Tex-Lee
received from Union Pacific. Clearly, the lease from Luecke to his captive
corporation, Tex-Lee, was a sham transaction entered into for the sole purpose
of depriving Wallace of her full interest.  This evidence establishes as a
matter of law that Luecke, as owner of the executive right, did not obtain for
Wallace every benefit he obtained for himself.

The trial court did not
err in granting Wallace partial summary judgments because (1) it properly
construed the unambiguous reservation in the 1984 deed and (2) it correctly
concluded that Luecke breached the fiduciary duty he owed Wallace.

Id. at 274–75;
see also Shelton v. Exxon Corp., 719 F. Supp. 537, 544–45 (S.D.
Tex. 1989) (noting that Texas cases finding breach of “fiduciary” duty in oil
and gas law have involved disproportionate benefits or inappropriate
consideration inuring to the executives under the terms of the contract or
lease or as a result of its execution, including an element of unjust
enrichment or self-dealing), aff’d in part, rev’d in part, 921 F.2d 595,
600 (5th Cir. 1991) (noting that the Texas Supreme Court has explained that the
duties of the executive arise from the relationship itself and the inherent
potential for abuse, particularly if the executive rights holder manipulates
lease terms so that benefits usually shared by all mineral owners inure solely
to the executive’s benefit).

(3) Further Refinement of the Law by
the Texas Supreme Court, 2003–Present

In 2003, the supreme court continued on its path of
referring to the “fiduciary” duty owed by the executive in In re Bass,
113 S.W.3d 735 (Tex. 2003) (orig. proceeding), even though the way the duty has
been viewed and applied in oil and gas law has varied substantially from its
application in other areas of law.[12] 
In Bass, NPRI owners sought discovery of the mineral estate owner’s
geological seismic data to prove that the mineral estate owner had breached an
implied duty to develop the land.  Id. at 737.  The court stated that
the NPRI owners had confused a fiduciary duty with the duty to develop; these
duties evolved under different legal theories, and the court explained this,
stating,

[A] duty to develop a mineral estate
arises not from a fiduciary relationship, but from the implied covenant
doctrine of contracts law in which courts read a duty to develop into an oil
and gas lease when necessary to effectuate the parties’ intent.  Conversely, a
fiduciary duty arises out of agency law based upon a special relationship
between two parties.

Id. at 743
(citations omitted).

The court distinguished Schlittler by stating
that it had “involved a very narrow duty in which a grantee, after executing
a mineral lease, owes a duty of the utmost fair dealing to protect the amount
of the grantor’s royalty.  The [Schlittler] duty, therefore, arises in
conjunction with the execution of a lease.”  Id. at 744.  Because the
relator in Bass had not yet executed a lease, the court held that no
duty to protect the amount of the NPRI owners’ royalty reservation had yet
arisen.  Id.  The court went on to state that even if the relator had
executed an oil and gas lease, the royalty reservation amount was explicitly stated
in the deed, in contrast to Schlittler.[13] 
Id.  Thus, if and when a lease was executed, the relator would be aware
of exactly how much to pay the NPRI owners.  Id.

The court stated that Manges had extended the Schlittler
duty by creating a fiduciary duty between executive and non-executive interest
holders (which include NPRI holders) in mineral deeds for the executive to
acquire every benefit for the non-executive that the executive would acquire
for himself.  Id. at 745.  The court distinguished Bass from Manges,
not on the cotenancy basis—although it acknowledged that Manges
involved a dispute between mineral estate cotenants—but by pointing out that
there was no evidence of self-dealing because no leasing to anyone had occurred
yet.  Id.  “Because [relator] has not acquired any benefits for himself,
through executing a lease, no duty has been breached.”  Id.; see also
PYR Energy Corp. v. Samson Res. Co., 470 F. Supp. 2d 709, 722 (E.D. Tex.
2007) (“The issue of the duty of the holder of such a right arises when the
‘executive’ executes a lease that affects some other person’s interest as well
as the executive’s.”).

Most recently, the supreme court addressed the executive
rights holder’s duty in Lesley v. Veterans Land Board. of the State of Texas,
352 S.W.3d 479 (Tex. 2011), another deed construction case.  In Lesley, a
land developer who owned part of the mineral estate and all of the executive
right, imposed restrictive covenants limiting oil and gas development in a
subdivision to protect lot owners from intrusive exploratory, drilling, and
production activities.  Id. at 481.  The NPRI owners complained that the
developer, as the executive, had breached his duty to them.  Id.

The court restated that one of the case’s principal
issues was “the nature of the duty that the owner of the executive right owes
to the non-executive interest owner, and whether that duty has been breached.” 
Id. at 487.  It noted that 

[i]f the exclusive right to lease the
minerals could be exercised arbitrarily or to the non-executive’s detriment,
the executive power could destroy all value in the non-executive interest,
appropriating its benefits for himself or others.  The law has never left
non-executive interest owners wholly at the mercy of the executive.  But the
variety of non-executive interests and the reasons for their creation, and the
effects of changing circumstances, make it difficult to determine precisely
what duty the executive owes the non-executive interest.

Id. at
487–88 (footnotes omitted).  The court summarized the duty described in Schlittler
as “to negotiate a fair royalty,” before stating that it had characterized an
executive’s duty of utmost fair dealing as fiduciary in nature.  Id. at
488–89 (citing Andretta and Manges).  The court clarified that unlike
an agent-principal fiduciary duty, the executive’s duty is to acquire for the
non-executive every benefit that he exacts for himself,[14]
before concluding that by filing the restrictive covenants that prohibited
drilling, the executive had breached its duty to the NPRI owners.  Id.
at 490–91.  Although the court referred to National Plan Administrators when
it distinguished the traditional fiduciary duty between agent and principal
from the one owed by an executive rights holder in oil and gas law, it did not
otherwise apply or discuss the case in determining, once more, the issue of the
executive’s duty to the NPRI holder.[15] 
See id. at 490 & n.72.

(4) Analysis

After Bass but prior to Lesley, cases
like Marrs & Smith Partnership v. D.K. Boyd Oil & Gas Co. relied
on Hlavinka’s footnote.  See 223 S.W.3d 1, 14–15 (Tex. App.—El
Paso 2005, pet. denied) (tracing the development of the law and citing Hlavinka
for the proposition that “[c]ases interpreting Manges have concluded
that when the executive and non-executive are co-tenants in the mineral estate and
there is a relationship of trust and confidence between the parties, a
fiduciary relationship exists between the executive and non-executive mineral
interest owner”).  However, we think that Bass and Lesley make it
appear that the supreme court has chosen to follow a relationship theory based
on the terms of the NPRI reservation and on the presence or absence of
self-dealing.  Therefore, after Lesley, our prior holdings in Hawkins
and Dearing remain the proper course to follow with regard to the
determination of a duty and the applicable standard.  See also Friddle
v. Fisher, 378 S.W.3d 475, 481–82 (Tex. App.—Texarkana 2012, pet. filed).

Based on our review of the development of this area of
law, the level of duty owed by the executive rights holder depends on the
amount of control placed in his or her hands by the terms of the NPRI reservation
itself—i.e., whether a fraction of royalty or a fractional royalty is
reserved.  As we previously determined in Bradshaw I that Bradshaw’s
NPRI here is a fraction of royalty, see 266 S.W.3d at 496, Steadfast
owed Bradshaw a “fiduciary” duty under the existing body of oil and gas law. 
And because Bradshaw presented some evidence that a 1/8 royalty was below
market for Hood County at the time Steadfast leased the property to Range, that
a higher royalty had originally been contemplated by Steadfast, and that the per
acre bonus was higher than what was customary in Hood County at that time, a
fact question remains as to whether Steadfast breached its duty by obtaining the
minimum 1/8 royalty unless Steadfast’s estoppel by deed argument prevails.

b.   Estoppel by Deed

Steadfast also argues that Bradshaw’s claim is barred
by the affirmative defense of estoppel by deed.

Estoppel by deed prevents a party from claiming a
position inconsistent with a grant and precludes parties to a valid instrument
from denying its full force and effect by binding them to the recitals,
reservations, and exceptions in the deed.  Angell v. Bailey, 225 S.W.3d
834, 841–42 (Tex. App.—El Paso 2007, no pet.).  Here, however, estoppel by deed
does not preclude Bradshaw from arguing that Steadfast breached its duty
because Bradshaw is not attempting to invalidate a recital or reservation in
the 1960 Deeds; instead, Bradshaw argues that Steadfast has breached a duty
that arose from their relationship and that was owed to her when Steadfast obtained
an oil and gas lease.  See Manges, 673 S.W.2d at 183 (“The fiduciary
duty arises from the relationship of the parties and not from contract.”).  Further,
Bradshaw has not attempted to deny the 1960 Deeds’ validity nor to deny that
Steadfast has the exclusive executive right to lease the minerals.  Rather, as
discussed in Bradshaw I and above, the reservation in the deeds
establishes a “floor for the royalty,” and the duty arises from the
relationship of the executive and NPRI owner.  See Bradshaw I, 266
S.W.3d at 496; see also Lesley, 352 S.W.3d at 490–91; Manges, 673
S.W.2d at 183.  Therefore, we conclude that estoppel by deed does not apply,
and we sustain Bradshaw’s first issue.

C.  Range’s Summary Judgment

1.  Range’s Motion

Range filed a motion for summary judgment against
Bradshaw in July 2010.  In its motion, Range argued that Bradshaw’s sole claim
against it was that it had conspired with Steadfast to commit a tort and that
since the trial court had determined that Steadfast had not committed a tort as
a matter of law, Range could not be liable for conspiracy to commit a tort or
for aiding or abetting the commission of a tort.

Range further argued that even if the trial court had
not previously determined that Steadfast had not committed any tort, summary
judgment would still be appropriate because Range had an absolute legal right
to enter into arm’s-length negotiations and contract with Steadfast for the oil
and gas lease at issue.  It also complained that because it had no duty to
Bradshaw, her claims for conspiracy and aiding and abetting were negated as a
matter of law and were also precluded by the defenses of privilege and
justification.

Range attached to its motion the exhibits that were
attached to Steadfast’s second motion for summary judgment,[16]
as well as a copy of the oil and gas lease between Steadfast and Range showing
the 1/8 royalty and referencing the cash bonus.  Range asked the trial court to
take judicial notice of the contents of its file, including the live pleadings,
Steadfast’s second summary judgment motion, and the trial court’s order granting
Steadfast’s second motion.

2.  Bradshaw’s Response

In her response to Range’s motion, Bradshaw conceded
that unless Steadfast had breached a duty to her, Range would not be liable to
her for aiding and abetting or conspiracy.  But she argued that because
Steadfast owed her a duty that it had breached, her claims against Range were
still valid.  Bradshaw further argued that neither of the affirmative defenses
that Range claimed applied to her claims because her conspiracy and aiding and
abetting claims were based on a breach of a duty sounding in tort, not on a
contract or on interference with a contract.

3.  Bradshaw’s Second Issue

In her second issue, Bradshaw contends that the trial
court erred by granting summary judgment for Range on her conspiracy and aiding
and abetting claims against Range.  Specifically, she complains that (1) Range’s
summary judgment motion was based primarily on the trial court’s ruling that
Steadfast did not breach any duty to her; (2) Range failed to meet its summary
judgment burden of conclusively negating an essential element of her claims; (3)
the affirmative defenses of justification and privilege do not apply to her
claims; and (4) Range did not offer any summary judgment evidence to support
these affirmative defenses.

Range responds that the trial court properly rendered
summary judgment on Bradshaw’s claims against it because: (1) Steadfast did not
commit an underlying tort; (2) Range had an absolute right to enter into arm’s
length negotiations to advance its own financial, legal, and business
interests; (3) the uncontroverted summary judgment evidence negated elements of
Bradshaw’s conspiracy claim; and (4) Range was privileged and justified in
exercising its legal rights in negotiating the transaction with Steadfast.

Because we have concluded above that Steadfast, in
fact, owed Bradshaw a duty and that a fact issue remains with regard to whether
Steadfast breached this duty, we sustain the first portion of Bradshaw’s second
issue.  Further, because the underlying tort—Steadfast’s alleged breach of
duty—is the basis for Bradshaw’s civil conspiracy and aiding and abetting
claims against Range, we sustain the second portion of Bradshaw’s second issue.
 See Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996) (op. on reh’g)
(stating that civil conspiracy is a derivative claim of an underlying tort for
which the plaintiff “seeks to hold at least one of the named defendants liable”);
Anderton v. Cawley, 378 S.W.3d 38, 54 (Tex. App.—Dallas 2012, no pet.)
(concluding that when the trial court erred by granting summary judgment on
breach of fiduciary duty, it also erred by granting summary judgment on the
derivative claim for aiding and abetting breach of fiduciary duty); see also
Mims, 810 S.W.2d at 880–81 (stating that a lessee can be held liable to the
NPRI owner if the lessee induces or participates in the executive’s breach or
agrees with the executive to an arrangement made to exclude or minimize the
NPRI owner’s benefits).

And while a defendant is entitled to summary judgment
on an affirmative defense if the defendant conclusively proves all the elements
of the affirmative defense, to accomplish this, as pointed out by Bradshaw, the
defendant-movant must present summary judgment evidence that conclusively establishes
each element of the affirmative defense, which Range has not done.[17]
  See Frost Nat’l Bank v. Fernandez, 315 S.W.3d 494, 508–09 (Tex.
2010), cert. denied, 131 S. Ct. 1017 (2011); see also
Tex. R. Civ. P. 166a(b), (c); Chau v. Riddle, 254 S.W.3d 453, 455 (Tex.
2008).  Therefore, we sustain the remainder of Bradshaw’s second issue.

D.   Summary Judgment on Constructive Trust and Fraud Claims

1.   
The Royalty Holders

Three days prior to the filing of Bradshaw’s first
amended petition, the Royalty Holders filed their second motion for summary
judgment, opposing the imposition of a constructive trust and arguing that the
undisputed summary judgment evidence showed that Bradshaw had no interest in
the identifiable res—their shares of the royalty interest—and that Bradshaw
could not establish unjust enrichment.  These parties supplemented their motion
after Bradshaw filed her second amended petition to add a request for summary
judgment on Bradshaw’s “recently concocted claim for imposition of a
constructive trust on the accrued royalties payment made and to be made in the
future as a result of [the Royalty Holders’] ownership of a fractional royalty
interest,” and they filed their third motion for summary judgment in July 2010
to address Bradshaw’s claims under the Uniform Fraudulent Transfers Act (UFTA).

In their third motion, the Royalty Holders argued that
the trial court’s ruling on Steadfast’s second motion for summary judgment
conclusively established that Steadfast did not have a “debtor” relationship
with Bradshaw at the time of the transfers of the fractional royalty interests
to the Royalty Holders, conclusively negating Bradshaw’s UFTA claims.  They
also argued that there was no evidence to support Bradshaw’s claim that the
transfers to them by Steadfast were “fraudulent” under business and commerce
code sections 24.005(a), 24.005(b), or 24.006.

2.   
Bennis

Bennis filed a no-evidence motion for summary judgment
nine days after Bradshaw filed her first amended petition, stating that he and
Humphreys had owned the right to purchase the Mitchell Ranch from Wise Asset,
which they had assigned to Steadfast for a cash payment and a fixed NPRI of
1.5625% not tied to the lease between Steadfast and Range, before Steadfast
sold the surface rights to, and entered into the oil and gas lease with,
Range.  Because he never owed Bradshaw a fiduciary duty, Bennis argued that
there could be no breach that would support a constructive trust against him
and that there was no evidence of his unjust enrichment.  He also argued that
there was no evidence that he had committed fraud against her.

Bennis filed a traditional and second no-evidence
motion for summary judgment in July 2010 on Bradshaw’s UFTA claim, but Bradshaw
has abandoned this claim against Bennis on appeal.

3.   
Korb

Korb filed a motion for traditional and no-evidence
summary judgment against Bradshaw on her constructive trust claim with regard
to her breach of fiduciary duty and fraud arguments, arguing that as a matter
of law, he owed Bradshaw no fiduciary duty, did not commit actual fraud, and
had not been unjustly enriched and that there was no identifiable res to impose
a constructive trust upon.  Korb also argued that there was no evidence to
support imposition of a constructive trust.

Korb filed his second traditional and no-evidence
motion for summary judgment against Bradshaw in July 2010 on her UFTA claim.  Bradshaw
has abandoned her UFTA claim against Korb on appeal.

4.   
Bradshaw’s Responses

In her response to Korb’s and Bennis’s motions for
summary judgment, Bradshaw stated that her request for a constructive trust as
to Korb’s and Bennis’s interests was based on the royalty amount set out in the
Steadfast-Range lease, which affected the amount of the royalty proceeds that
she, Korb, and Bennis were entitled to as NPRI holders based on Steadfast’s
breach of fiduciary duty, and that she otherwise claimed no right, title, or interest
in the Bennis and Korb royalties.  She also argued that she did not have to
prove that Bennis and Korb owed her a fiduciary duty or perpetrated fraud on
her in order to demonstrate a superior right to the proceeds and for the
imposition of a constructive trust.  Bradshaw attached thirty-seven exhibits to
her response to Bennis and Korb’s motions for summary judgment, including the
email from Shipman to Humphreys, which was forwarded by Humphreys to Bennis,
with regard to Steadfast’s initial offer of a 25% royalty interest lease
agreement as the “best alternative to avoid litigation regarding the Bradshaw
interest,” and an email from Bennis to Humphreys about whether there were other
agreements with R.J. Sikes that resulted in the sale to Steadfast instead of to
Chesapeake.  She also attached part of Bennis’s deposition, including his
description of the April 17, 2006 meeting led by R.J. Sikes in which somehow
Bennis received the interest now in controversy, which we have already set out
above.  Additional exhibits included the April 27, 2006 special warranty deed
from Wise Asset #2 to Steadfast; the April 27, 2006 special warranty deed from
Steadfast to Range; the April 27, 2006 memorandum of paid up oil and gas lease
from Steadfast to Range; and the April 27, 2006 royalty deed from Steadfast to
Bennis.[18]

Bradshaw responded to the Royalty Holders’ motions in
her responses to Steadfast and acknowledged that the Royalty Holders, Bennis,
and Korb would not be liable to her for fraudulent transfer if Steadfast had
committed no breach of duty owed to her.

5.   
 Bradshaw’s Third and
Fourth Issues

In her third issue, Bradshaw argues that the trial
court erred by granting summary judgment on her claims against the Royalty
Holders, Bennis, and Korb for the imposition of a constructive trust over the
proceeds of the royalty interests possessed by them because:  (1) this claim
did not require her to show that Bennis or Korb breached a fiduciary duty to
her or committed fraud against her; (2) the proceeds of the royalty interests
held by the Royalty Holders, Bennis, and Korb are directly traceable to the
royalty interest that Steadfast wrongfully deprived her of; (3) the Royalty
Holders, Bennis, and Korb would be unjustly enriched if they were allowed to retain
the proceeds of royalties that rightfully belong to her; and (4) she presented
more than a scintilla of evidence to support each of the challenged elements of
her constructive trust claim.

In her fourth issue, Bradshaw argues that the trial
court erred by granting summary judgment on her fraudulent transfer claims
against the Royalty Holders because they were based, in large part, on the
trial court’s ruling that Steadfast did not breach any duty to her and because
the summary judgment evidence raises a fact issue with regard to whether
Steadfast’s conveyances of the royalty interests to the Royalty Holders were
fraudulent under the UFTA.

6.   
Constructive Trust and UFTA

A constructive trust is an equitable remedy created by
the courts to prevent unjust enrichment and may be imposed based on a fiduciary
or confidential relationship or when there has been actual fraud.  Swinehart
v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 48 S.W.3d 865,
878 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh’g).  To
establish a constructive trust, the proponent must prove (1) the breach of a
special trust or fiduciary relationship or actual or constructive fraud; (2)
the unjust enrichment of the wrongdoer; and (3) tracing to an identifiable
res.  Hubbard v. Shankle, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth
2004, pet. denied).

In Friddle, one of the most recent cases to
address the executive-NPRI “fiduciary” duty issue, the Texarkana court stated,

If the holder of the executive right
receives royalties pursuant to the rights held by an NPRI holder, he is
chargeable in equity as constructive trustee with the duty to hold the royalty
attributable to the holder of the NPRI, whatever it may be, subject to the
demand of the NPRI holder.

378 S.W.3d  at 481 (citing Andretta, 415 S.W.2d
at 641–42).  In Mims, the same court stated that a constructive trust
applies in cases of actual fraud as well as situations involving a breach of
fiduciary duty.  810 S.W.2d at 881.  And the supreme court has stated that the
policy against unjust enrichment mandates that a third party not be allowed to
retain property he receives as a beneficiary of another’s fraud.  Ginther v.
Taub, 675 S.W.2d 724, 728 (Tex. 1984) (noting that a constructive trust can
be imposed on a knowing or unknowing beneficiary of fraud, even if he is not
the actual wrongdoer); see also Pope v. Garrett, 147 Tex. 18, 211 S.W.2d
559, 562 (1948).

Under the UFTA, a “debtor” is “a person who is liable
on a claim,” and a “creditor” is a person “who has a claim.”  Tex. Bus. &
Com. Code Ann. § 24.002(4), (6) (West 2009).  A “claim,” under the UFTA,
is “a right to payment or property, whether or not the right is reduced to
judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,
disputed, undisputed, legal, equitable, secured, or unsecured.”  Id. §
24.002(3).  The sections following section 24.002 establish when a transfer by
a debtor is fraudulent as to a creditor, the types of relief available
(including avoidance of the transfer and equitable remedies), and the
affirmative defense of good faith.  See id. §§ 24.005–.006,
.008–.009 (West 2009).

Steadfast leased the property to Range for a 1/8
royalty and sizable leasing bonus instead of a 1/4 royalty, thereby, as argued
by Bradshaw, breaching its fiduciary duty to her by leaving her with only a
1/16 royalty (1/2 of the 1/8 royalty) instead of a 1/8 royalty (1/2 of the 1/4
royalty).  Bradshaw seeks the difference between the royalty she actually
received and the royalty she would have received had no alleged breach
occurred, potentially affecting the distribution of proceeds under the present
royalty to the Royalty Holders via the NPRI transfers by Steadfast, and she
seeks to set aside the transfers to the Royalty Holders, which she argues are
fraudulent.[19]
 See Hubbard, 138 S.W.3d at 485.  As we have concluded that Steadfast
owed a fiduciary duty to Bradshaw and that there is a genuine issue of material
fact with regard to whether Steadfast breached that duty by engaging in
self-dealing and conspiring with others to Bradshaw’s detriment—one of the bases
for Bradshaw’s constructive trust and UFTA claims against the Royalty
Holders—we cannot say that they were entitled to summary judgment as a matter
of law.  Therefore we sustain Bradshaw’s third issue in part, and we sustain
her fourth issue.[20] 
On remand, if the factfinder concludes that no breach occurred, then these
constructive trust and UFTA issues will be moot.

However, with regard to Bennis and Korb, because
Bennis received his interest at the same time that Steadfast signed its
agreements with Range, because there is no evidence that Bennis engaged in
fraud or that Bradshaw would otherwise have an interest in the share that he—or
by extension, Korb—received, and because Bradshaw has abandoned on appeal her
UFTA claims against both of them, Bennis and Korb were entitled to summary
judgment.  Therefore, we overrule Bradshaw’s third issue in part.

IV.  Conclusion

Having sustained Bradshaw’s first, second, and fourth issues
and having sustained part of her third issue, we reverse the trial court’s
orders granting summary judgment for Steadfast, Range, and the Royalty Holders
and remand those claims to the trial court for further proceedings.  Having
overruled part of Bradshaw’s third issue, we affirm the trial court’s summary
judgments for Bennis and Korb.

 

                                                                             BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

 

DELIVERED:  February 14, 2013









[1]An
NPRI is

an interest in the gross production of
oil, gas, and other minerals carved out of the mineral fee estate as a free
royalty, which does not carry with it the right to participate in the execution
of, the [b]onus payable for, or the delay rentals to accrue under oil, gas, and
mineral leases executed by the owner of the mineral fee estate.

Lee Jones, Jr., Non-participating
Royalty, 26 Tex. L. Rev. 569, 569 (1948).  The leasing privilege is
commonly referred to as the “executive right,” and an NPRI “may [b]e created by
grant or reservation either prior or subsequent to a lease of the land for oil
and gas purposes.”  Id.





[2]Steadfast
also assigned portions of its royalty interest to Bennis and Roger Sikes, and
Bennis conveyed one-eighth of his royalty to Korb.





[3]We
addressed some of the parties’ first motions for summary judgment in Bradshaw
I.  See 266 S.W.3d at 491.





[4]In
an unnumbered issue contained in footnote 9 of her appellant’s brief, Bradshaw
complains that the trial court erred by overruling her evidentiary objections
to Sikes’s affidavit.  However, we need not reach this argument because, even
assuming that the trial court did not err by considering Sikes’s affidavit in
light of Bradshaw’s objections, our resolution of Bradshaw’s appeal turns on a
question of law, and—as discussed below—based on our resolution of the legal
question, Bradshaw has produced sufficient evidence to show that genuine issues
of material fact remain in this case.  See Tex. R. App. P. 47.1.





[5]The
trial court held a hearing on July 1, 2010, to consider Steadfast’s second
motion.  Bradshaw objected that Steadfast’s proposed order on the motion did
not address some of her claims.  The trial court granted Steadfast’s second
motion after Steadfast filed its third motion to address any of Bradshaw’s
remaining claims.  Steadfast argued in its third motion that

[t]o the extent additional cause(s) of
action are asserted against Defendant Steadfast Financial, LLC. [sic] by
Plaintiff, all such causes or claims for relief are derivative of
Plaintiff’s assertion that such Defendant’s conduct in entering into the oil
and gas lease with Range Production I was a breach of a “fiduciary” duty. 
Such claim has been determined by the Court’s granting of Defendant Steadfast
Financial, LLC’s Second Motion for Summary Judgment.  The absence of any
actionable breach of duty by Steadfast Financial, LLC negates a requisite
elements [sic] of each of the other claims that Plaintiff has asserted or which
could be read to be asserted in her live pleadings, namely:  declaratory
relief, unconscionable conduct, interference with property rights, reformation,
disgorgement and/or exemplary damages.

[Emphasis added.]





[6]The
deeds under which Manges obtained the executive right provided that he was not
to lease the Guerras’ mineral interest for less than a 1/8 royalty and that the
Guerras were to participate in all bonuses, rentals, royalties, overriding
royalties, and payments out of production.  Id. at 181–82.





[7]Pickens
had researched the land’s mineral potential and learned that 98,000,000 barrels
of recoverable tar could be produced.  764 S.W.2d at 259.  He received an offer
to lease for $10/acre cash bonus, a ten-year primary term, and a 1/8 royalty
but refused it on the ground that the cash bonus was inadequate, the royalty
too small, and other lease provisions were unacceptable.  Id.  He
subsequently received an offer to lease for a cash bonus of $30–35 per acre,
but he rejected this offer too, as well as one for a cash bonus of $269,000, a
five-year primary term, a royalty of 17.5%, and an annual delay rental of $5
per acre, as well as an offer and counteroffer made after the lawsuit had been
filed.  Id.  Only after Hope’s royalty term had expired did Pickens
execute a lease on the ranch; however, the lease excluded tar sands, the lessee
drilled a dry hole, and the lease terminated for failure to obtain production
of oil or gas.  Id. at 260.





[8]The
San Antonio court reversed the trial court’s judgment after holding that the
evidence did not support the jury’s finding that Pickens breached a duty to
Hope of good faith and utmost fair dealing in failing to lease the land to
another for mineral development or to develop the minerals himself and that
there was no evidence that Pickens owed Hope a fiduciary duty or breached such
a duty or that Pickens breached the duty of an ordinary, prudent landowner in
failing to lease the land for tar production or in failing to produce the tar
himself.  Pickens, 764 S.W.2d at 271.





[9]The
Jones lease was for a primary term of two years, a 1/8 royalty, a bonus of $100
per acre, and surface damages of $3,000 for the first well and $1,000 per
additional well.  Hawkins, 810 S.W.2d at 445.  The Twin Montana lease
was for a primary term of one year and provided for a 1/4 royalty, a bonus of
$100 per acre, and surface damages of $500 per well.  Id.





[10]That
is, it was a “fractional royalty.”  See Bradshaw I, 266 S.W.3d at 493.





[11]That
is, it was a “fraction of royalty.”  See id.





[12]See
Patrick H. Martin, Unbundling the Executive Right:  A Guide to
Interpretation of the Power to Lease and Develop Oil and Gas Interests, 37
Nat. Resources J. 311, 376, 397 (1997) (noting that “fiduciary” in the context
of executive and nonexecutive rights is not used in the strictest sense of the
term and that it should not be treated as a true fiduciary standard because to
do so would turn the relationship of the executive and nonexecutive “on its head
and deprive[] the executive right holder of his bargain”); see also
Bruce M. Kramer, A Renaissance Year for Oil and Gas Jurisprudence:  the
Texas Supreme Court, 18 Tex. Wesleyan L. Rev. 627, 657 (2012) (stating that
“as courts and commentators have noted, it is clear that the standard described
in Manges is not the classic, self-sacrificing fiduciary duty that
applies to trustee/beneficiary and attorney/client relationships”).





[13]In
Schlittler, the court construed the term royalty reservation as one-half
“of such royalty as may be reserved in any oil, gas, or mineral lease which may
be executed” by the executive rights holder.  101 S.W.2d at 544–45.  In
contrast, the Bass NPRI owners possessed a flat 1/3 of a 1/8 NPRI in the
land at issue.  113 S.W.3d at 738.





[14]In its discussion of Manges, the court stated
that while

a fiduciary duty often, as it would for
agent and principal, “requires a party to place the interest of the other party
before his own,” . . . we did not suggest in Andretta, HECI, or Manges
that this requirement was part of the executive’s duty.  Rather, we stated in Manges
that the executive’s duty is to “acquire for the non-executive every benefit
that he exacts for himself.”

Lesley, 352 S.W.3d at
490 (footnotes omitted).





[15]The
court also modified its earlier position in Bass, stating that when an
executive refuses to lease, if the refusal is arbitrary or motivated by
self-interest to the NPRI owner’s detriment, the executive may have breached
his duty.  Lesley, 352 S.W.3d at 490–91.





[16]The
Steadfast exhibits incorporated by Range, as set out above in our discussion of
Bradshaw’s first issue, consisted of Steadfast’s first request for admissions
from Bradshaw and her responses and R.J. Sikes’s affidavit with its attached
exhibit of the April 2006 contract of sale with Range.





[17]The
only evidence Range attached to support its contention that the transaction was
at arm’s length was Sikes’s affidavit, in which Sikes claimed that there was no
self-dealing, conspiracy, or collusion in negotiating and entering the
transaction between Steadfast and Range.  Range did not produce any evidence
from its own representatives about the transaction.  And while in his
affidavit, Sikes asserts that Steadfast did not take any overriding royalty
interest, any oil payment, or any bonus royalty, he does not address the amount
of the cash royalty mentioned in the lease.  Further, based on Bradshaw’s
summary judgment evidence, fact issues remain regarding the alleged underlying
tort, making summary judgment improper.





[18]Bennis
testified that on closing day, his attorney told him that the order of filing
did not matter because everything was being signed at once.





[19]To
the extent that Steadfast may have breached its duty to Bradshaw and then
conveyed portions of its royalty interest to the Royalty Holders in an attempt
to fraudulently evade her reach of the proceeds, Bradshaw may have a valid
claim for constructive trust as to the Royalty Holders.  However, because the
breach issue has yet to be resolved by a factfinder, we cannot yet reach the
merits of this issue based on the summary judgment record before us.





[20]The
Royalty Holders, Bennis, and Korb own fixed fractional royalties.  If the lease
is reformed to reflect an increased overall royalty, then Steadfast may also have
an NPRI in excess of what it granted to the others under the original lease
providing for a 1/8 royalty.